## STEWART v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. June 12, 1924.)

No. 6424.

1. **Post office ⬤⟿35—Fraudulent scheme to sell land not consummated on delivery of deed.**

In a prosecution for fraudulent use of mails, statement that alleged fraudulent scheme to sell arid land was completely executed and consummated when deed was delivered, cash paid, and notes and trust deed executed and delivered, *held* to rest on too narrow a view of alleged scheme.

2. **Post office ⬤⟿35—Not indispensable that letter should be sent to or received from intended victim.**

It is not indispensable that letter mailed in executing alleged fraudulent scheme to sell arid land, in violation of Criminal Code, § 215 (Comp. St. § 10385), should be directed to or received from one of intended victims.

3. **Post office ⬤⟿35—Not necessary to show that letters were or would be effective.**

In prosecution of a fraudulent scheme, under Criminal Code, § 215 (Comp. St. § 10385), it is not necessary to allege or show by face of letters alleged to have been mailed in furtherance of scheme, that letters were or would be effective.

4. **Post office ⬤⟿48(4)—Allegation that defendant mailed letters in execution of scheme held sufficient.**

It is sufficient to allege that defendant mailed letters set forth in indictment in execution of fraudulent scheme, unless letters clearly show that they probably could not have any effect in execution or furtherance of it.

5. **Post office ⬤⟿35—Certain letters held to have, and others not to have, any effect in execution of fraudulent scheme.**

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), letters set forth in twelfth and thirteenth counts *held* not to show, and letters in counts 15 and 16 to show, that they probably could not have had any effect in execution or furtherance of alleged fraudulent scheme.

6. **Criminal law ⬤⟿1177—If any one of sentences running concurrently lawful, it must be affirmed.**

If a sentence for same term was imposed on defendant on each of several counts, terms to run concurrently, and was lawfully imposed on any one count, it must be affirmed.

7. **Criminal law ⬤⟿175—Subsequent trial, after acceptance of plea of nolo contendere, not barred.**

Offer, acceptance, and entry of plea of nolo contendere *held* not bar to later prosecution, and such prosecution does not place defendant twice in jeopardy, in violation of Const. Amend. 5.

8. **Criminal law ⬤⟿275—Courts authorized during term to set aside action on plea of nolo contendere.**

Courts have jurisdiction and authority, during term at which their orders, judgments, and decrees are made, to set them aside and substitute others for them, or to amend or otherwise modify them, until or unless they have been executed in whole or in part, or rights of parties will be injured by such action, and that rule applies to pleas of nolo contendere that have been filed and accepted.

9. **Criminal law ⬤⟿1149—Indictment and information ⬤⟿136—Denial of motion to quash indictment for absence of evidence ordinarily discretionary, and reviewable only for abuse.**

Grant or denial of a motion to quash the indictment for absence or incompetency of evidence before a grand jury is ordinarily discretionary with trial court, and reviewable only for abuse of its discretion.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Criminal law ⚖⇒1158(2)—Refusal to direct verdict presents question whether there was any substantial evidence inconsistent with guilt.**

An assignment of error that court refused to direct acquittal presents, not the question of preponderance of evidence, but whether there was any substantial evidence inconsistent with the defendant's innocence, which excludes every other hypothesis than that of his guilt.

**11. Post office ⚖⇒49—Evidence of participation in fraudulent scheme held sufficient.**

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), evidence *held* to support finding that defendant devised or participated in execution of a fraudulent scheme, or in causing or making false representations or promises.

**12. Criminal law ⚖⇒864—After jury had failed to agree, asking whether there was larger preponderance one way or other held error.**

After jury had deliberated for a day and failed to agree, and court had told foreman that it did not wish him to say how jury stood, to ask him whether they were evenly divided, or whether there was a larger preponderance one way or the other, and thereby eliciting answer that there seemed to be a larger preponderance one way, *held* error.

**13. Criminal law ⚖⇒865(1)—Supplemental instruction as to desirability of jury agreeing held error.**

Where jury had deliberated many hours and had disagreed, a supplemental instruction that, if jury can consistently and by consultation with each other reach a verdict, it is highly desirable to do so, *held* to have too strong a tendency towards coercion of minority of jury.

**14. Criminal law ⚖⇒957(1)—Jurors incompetent to prove facts stated in affidavits.**

Jurors *held* incompetent to prove alleged facts stated in their affidavits.

**15. Criminal law ⚖⇒957(3)—Excerpts from newspapers held immaterial, in absence of competent testimony that jurors read them.**

Affidavit of publication of excerpts from newspapers and excerpts themselves *held* immaterial, without evidence other than that of jurors tending to show that they were read by jurors.

**16. Criminal law ⚖⇒1162—Error without prejudice no ground for reversal.**

Error without prejudice is no ground for reversal.

**17. Criminal law ⚖⇒811(2)—Refusal of requested instruction, singling out one of several misrepresentations, and directing jury to return verdict for defendant unless it was made, held not error.**

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), refusal of a requested instruction singling out one of several misrepresentations charged, to sustain others of which there was substantial evidence, directing jury to return verdict for defendant unless that particular representation had been made with defendant's knowledge and consent, *held* not error.

**18. Post office ⚖⇒50—Whether victims were prevented from seeing other people held for jury.**

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), whether victims who went on excursions to see land were kept so they could not see people living in community *held* a question for jury.

Reeves, District Judge, dissenting in part.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

W. E. Stewart was convicted for attempting to use and using a post office in the execution of a fraudulent scheme, and he brings error. Judgments and sentences reversed, and case remanded, with directions to grant a new trial.

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

R. R. Brewster, of Kansas City, Mo. (M. J. Henderson, A. R. Mc-Clanahan, and William B. Bostian, all of Kansas City, Mo., on the brief), for plaintiff in error.

W. H. Hallett, Sp. Asst. U. S. Atty., and Charles C. Madison, U. S. Atty., both of Kansas City, Mo.

Before SANBORN, Circuit Judge, and BOOTH and REEVES, District Judges.

SANBORN, Circuit Judge. The plaintiff in error below, and henceforth the defendant Stewart, was indicted, tried, convicted, and sentenced for attempting to use and using the Post Office Department of the United States in the attempted execution and in the execution of an alleged scheme to obtain money and property by means of false pretenses, representations, and promises, in violation of section 215 of the Criminal Code (Compiled Statutes, § 10385). He demurred to the indictment, the court overruled the demurrer, and that ruling is assigned as error. The chief averments of this indictment were:

(1) That defendant Stewart and the other defendants, between August 15, 1919, and July 6, 1920, devised a scheme to defraud 23 persons specifically named in the indictment, and others to the grand jurors unknown, of their money and property for the use and benefit of the defendants and of the W. E. Stewart Land Company and the Stewart Farm Mortgage Company, two corporations owned and controlled by Stewart, by inducing the persons intended to be defrauded by false representations, pretenses, and promises which the defendants did not intend to perform, made by the defendants orally and by statements, circulars, letters, maps, advertisements, and papers so worded as to deceive them to purchase arid lands owned by Stewart or some of his corporations in Hidalgo county, Tex., which were of little or no value, at prices of from $300 to $425 an acre, and to pay one-half of these purchase prices in cash and give vendor's liens secured by trust deeds on the land for the other half to the Stewart Farm Mortgage Company, a corporation, and by causing such notes and deeds of trust to be assigned to the Farm Mortgage & Loan Company, a corporation owned or controlled by one Zumbrunn, or to Zumbrunn himself, so as to defeat any defenses of the persons intended to be defrauded to actions that might be brought against them for the collection of their notes.

(2) That it was a part of this scheme that Stewart and the other defendants, in order to induce the intended purchasers to buy these lands and pay for them, should take them in Pullman cars from Kansas City, Mo., to Hidalgo county, Tex., entertain them for several days on the trips with dinners, stories, songs, and speeches, keep them from communicating with or securing information from others than the defendants, their agents and servants, should falsely pretend, represent, and promise to the intended purchasers, first, that the lands offered for sale to the several intended purchasers from the W. E. Stewart Land Company were under and would be irrigated and operated under the American Rio Grande Land & Irrigation Company's system of irrigation, otherwise known as and henceforth called the Mercedes

system, which was an efficient system of irrigation, that furnished to the lands under it an abundance of water when needed, when the fact was that the lands offered and to be sold to the intended purchasers specified in the indictment were under and would be irrigated, if at all, under the Edinburg system, which was an inoperative, broken down, and inefficient system that could not and would not furnish sufficient water when needed, without repairs, reconstruction of parts of it, and extensions at great expense; second, that the intended purchasers of such lands could and would receive all the water they needed or wanted whenever they needed or wanted it for irrigation on any of the lands they bought from the defendants or from the W. E. Stewart Land Company, and that all they would have to do to get it was to telephone the plant for it, when this entire representation was known by the defendants to be false; third, that the lands offered for sale and sold to the persons intended to be defrauded by the defendants and the W. E. Stewart Land Company were splendidly adapted to the growing of alfalfa, that an alfalfa crop planted on said lands would be ready to cut the first time within 12 or 14 weeks after the planting, when the fact was that the land offered and to be sold to the persons intended to be defrauded was not specially adapted to the growing of alfalfa, that a crop of alfalfa planted on such land would not be ready to cut the first time within 12 or 14 weeks after its planting, and it was difficult, if not impossible, to raise profitable crops of alfalfa upon the land generally.

The indictment contains averments that it was a part of the fraudulent scheme to make other false representations, pretenses, and promises to induce the intended purchasers to buy these lands, which it is unnecessary to recite at this time. After alleging the devising of this scheme and the specific false representations, pretenses, and promises the defendants planned to make as a part of it, the indictment charged that the defendants, in and for executing this scheme and attempting so to do, on October 29, 1920, placed and caused to be placed in a post office in Kansas City, Mo., a letter postpaid, directed to James Duffy, at Post Oak, Mo., one of the persons specified in the indictment as one of those whom the defendants planned to defraud, and set forth the letter, the substance of which was that the Stewart Farm Mortgage Company, the signer of the letter, held Duffy's first series of vendor's lien notes for $6,060, and that if he would take them up at that time it would allow him a discount of 5 per cent. on the face amount thereof, and would also waive the accrued interest from the last interest-paying date, thereby enabling him to save $333. Following this letter, which concludes the first count of the indictment, that instrument sets forth in separate counts, under like averments to those which have been stated, 15 letters, all but 4 of which are of the same general character as is that to Duffy.

Counsel for the defendant Stewart attacked these counts of the indictment upon the grounds that there was no allegation in the indictment that any of the persons to whom the letters were written had purchased lands on the Edinburg tract, nor that the letters were written to collect vendor's liens given on any such land, nor that they were written to purchasers upon any particular tract of land, nor that the persons to whom the letters were written bought their lands from the

Stewart companies. But these objections are clearly untenable in the face of the facts that the indictment sets forth the name of each one of the 12 persons to whom these letters were addressed and sent, and contains averments to the effect that it was a part of the fraudulent scheme of the defendants to obtain the money and property of each of these intended victims, by inducing them by the false representations and promises alleged to buy lands on the Edinburg tract on the terms specified in the indictment; that each of the 12 letters was sent to the addressees through the mails, in and for executing or attempting to execute the alleged scheme, and by the further fact that each of these letters appears on its face to have been written and sent by the Stewart Farm Mortgage Company to obtain money from each one of these intended victims, on account of his alleged liability on the lien notes of the character of those contemplated in the alleged scheme and described in the indictment.

[1] Another objection strenuously urged to these counts of the indictment is that the letters were not written or sent until after the scheme had been completely executed. Counsel argue that, when the sales of the respective tracts of land had been made, half of the purchase price had been paid in cash, and lien notes and a trust deed had been given by the purchasers, the alleged scheme was consummated; that the letters show that all this had been done before they were written or mailed; and that, therefore, they could not have been placed in any post office or other station or letter box of the United States, to be sent or delivered "for the purpose of executing such scheme or artifice or attempting so to do." Section 215, Criminal Code.

It is conceded that, if the first premise of this contention is true, the conclusion is sound (Lonabaugh v. United States, 179 Fed. 476, 479, 103 C. C. A. 56; Stewart v. United States, 119 Fed. 95, 96, 55 C. C. A. 641), and that there are authorities that tend to sustain and possibly do sustain such an interpretation of alleged schemes to defraud and their execution as counsel for the defendants contend should prevail in this case (Ex parte Black [D. C.] 147 Fed. 832, 839, 840; United States v. Dale [D. C.] 230 Fed. 750). But upon consideration our opinion is that the statement that the alleged fraudulent scheme in this case was completely executed and consummated in any case when the deed was delivered, the cash paid, and the notes and trust deed were executed and delivered rests upon too narrow a view of the scheme alleged in the indictment. The basic averment is that the defendants devised this scheme and artifice "to defraud said persons, intended to be defrauded, of their money and property, they, the said defendants, intending to convert the same to the use and gain of the said defendants, * * * without giving, or intending to give, the persons intended to be defrauded anything of an equivalent value, or of any value, in return for their said money and property." The subsequent averments in the indictment, that it was a part of the scheme to induce the intended purchasers to buy the land and pay half cash and half lien notes of the purchasers secured on the land, were allegations of the details or means by which they had planned to get the money and property of the intended purchasers, and the obtaining of their money and property

from the collection of the lien notes fell far within the alleged device or scheme, and, until those notes were collected, or further realization from them by the defendants and Stewart's corporations had become impossible or impracticable, the defendants would not have obtained all the money and property of the victims of the plan, which they had schemed to secure thereby, and until then the scheme would not completely be executed or consummated.

In the case of a scheme to defraud by the sale of books for cash and notes, a letter of the defendant to the victim, notifying him of the sending of the books and acknowledging the receipt of $500 and notes for $3,400 in payment therefor, was held by the Circuit Court of Appeals of the Second Circuit to have been in furtherance of the alleged fraudulent scheme to obtain the money and property of the victim, and the court declared that the defrauding of the victim would not have been fully completed until all the notes were paid. Farmer v. United States, 223 Fed. 903, 910, 139 C. C. A. 341. An application was made to the Supreme Court for a writ of certiorari to review and reverse this judgment, and that court denied it. 238 U. S. 638, 35 Sup. Ct. 940, 59 L. Ed. 1500. The Circuit Court of Appeals of the Seventh Circuit subsequently approved and followed the decision in that case in Preeman v. United States, 244 Fed. 1, 9, 156 C. C. A. 429. The demurrers to all the counts in the indictment, except the twelfth, thirteenth, fifteenth, and sixteenth were therefore properly overruled.

The twelfth count sets out a letter of September 24, 1920, from the defendant Parker, president of the W. E. Stewart Land Company at Kansas City, Mo., to Kirgan, the vice president of that company at Stewart Clubhouse, Mercedes, Tex., to the effect that the defendants Stewart and Parker agreed that it was necessary to do some improvement work on the Capisallo tract, and that Kirgan should proceed immediately to get the necessary lumber and hire workmen to commence the construction of a small frame store building and a small frame schoolhouse, and to arrange for a school-teacher, but that they did not think it necessary for this work to be pushed rapidly to completion, and that the writer believed that in doing this work the addressee would be able to dispose of some of the bad lands in the neighborhood of the town site of Capisallo. The thirteenth count contained a copy of an alleged letter dated at Kansas City, Mo., October 29, 1919, from the W. E. Stewart Land Company, by W. E. Stewart, to defendant Parker, vice president of that company, at Mercedes, Tex., to the effect that the writer had been informed that the Department of Justice had sent a man to Mercedes who was acting very indiscreetly, and that possibly it would be wise to look into the situation and to set themselves right with the Department of Justice. The fifteenth count recites a letter from defendant Stewart to defendant Ladd, dated July 6, 1921, to the effect that it was the latter's duty to make one Cornwall account for money he had taken from the excursions and had not reported, and that he ought also to collect the claim of like nature against McNear. The sixteenth count portrays a letter from the defendant Ladd, president of the International Farms Company, to W. E. Stewart, president of the Stewart Farm Mortgage Company, dated August 11,

1921, in answer to the letter in the fifteenth count wherein a promise is made to act in respect to the claims against Cornwall and McNear.

Counsel assail the twelfth count because "it had to do with proposed improvements on the Capisallo tract, which the record discloses was under the Mercedes system, and had no connection with the lands charged to have been fraudulently sold." The answer is that, when the court below ruled on the demurrer to this count, the record had not been made, and the fact that the Capisallo tract was not a part of the Edinburg tract did not appear.

[2] Counsel contend that the four counts were demurrable: (1) Because the letters pleaded in them passed between the defendants, or between one or more of them and one or more of Stewart's corporations, and none of the intended purchasers was a sender or addressee of any of them; (2) because they show on their faces that they were not intended to be, and could not be, effective in the execution of the fraudulent scheme; and (3) because none of them disclosed the fraudulent scheme or the probable efficacy of the letter in executing or furthering it. But it is not indispensable that the letter mailed in executing such a scheme under section 215 should be directed or sent to or received from one of the intended victims of the fraud. Preeman v. United States, 244 Fed. 1, 9, 156 C. C. A. 429.

[3, 4] Nor is it necessary, in the prosecution of a fraudulent scheme under section 215 of the Criminal Code, to allege or to show, by the face of the letters set forth in the indictment and alleged to have been mailed in furtherance of the scheme, that such letters were or would be effective in its execution. It is sufficient to allege that the defendants mailed the letters set forth in the indictment in the execution of the scheme, unless such letters clearly show on their faces that they probably could not have any effect in the execution or furtherance of it. Durland v. United States, 161 U. S. 306, 315, 16 Sup. Ct. 508, 40 L. Ed. 709; Lemon v. United States, 164 Fed. 953, 955, 956, 90 C. C. A. 617; United States v. Young, 232 U. S. 155, 161, 34 Sup. Ct. 303, 58 L. Ed. 548; Savage v. United States (C. C. A.) 270 Fed. 15, 18; Olsen v. United States (C. C. A.) 287 Fed. 85, 89; Stewart v. United States, 119 Fed. 89, 94, 95, 96, 55 C. C. A. 641; United States v. Ryan (D. C.) 123 Fed. 634, 636.

[5] Tested by this rule and by the opinions of the courts in the cases cited, the letters in the twelfth and thirteenth counts in our opinion do not clearly show, and the letters in counts 15 and 16 do clearly show, that they probably could not have had any effect in the execution or furtherance of the alleged fraudulent scheme. There was therefore no error in overruling the demurrers to counts 12 and 13, and there was error in overruling the demurrers to counts 15 and 16.

[6] If these were the only errors in the trial, they would result in the reversal of the judgments and sentences on counts 15 and 16 and the dismissal thereof, but would not affect the judgments upon the other counts, because there was a separate verdict and a separate sentence of five years' imprisonment and of a fine of $100 on each of the counts, making an aggregate fine of $1,600, and the terms of imprisonment were adjudged to run concurrently. Where a sentence of im-

prisonment for the same term is imposed upon the defendant upon each of several counts of an indictment, and the terms to run concurrently, if that sentence and judgment was lawfully imposed upon any one of the counts, it must be affirmed. Norton v. United States, 205 Fed. 593, 602, 123 C. C. A. 609; Morris v. United States, 229 Fed. 516, 522, 143 C. C. A. 584; Abrams v. United States, 250 U. S. 616, 619, 40 Sup. Ct. 17, 63 L. Ed. 1173; Baird v. United States, 196 Fed. 778, 779, 116 C. C. A. 73; Wisconsin Cent. Ry. Co. v. United States, 169 Fed. 76, 80, 94 C. C. A. 444.

[7] On November 28, 1922, defendant Stewart withdrew his demurrers, was duly arraigned, and tendered and filed his plea of nolo contendere, and the court accepted that plea and deferred sentence thereon. On December 2, 1922, the court ordered his plea of nolo contendere set aside, he refiled his demurrers, they were argued, the court overruled them, and he again filed his plea of not guilty. On February 2, 1923, he moved the court to set aside its decree of December 2, 1922, avoiding its order of November 28, 1922, accepting his plea of nolo contendere. The court denied that motion and he excepted. Thereupon he filed his plea in bar on the ground that the offer, acceptance, and entry of his plea of nolo contendere was a bar to his later prosecution on the indictment, and that such prosecution and his subsequent trial placed him twice in jeopardy, in violation of the Fifth Amendment to the Constitution of the United States. After argument the court overruled that plea, and he excepted. He now assigns as error the orders of the court setting aside his plea of nolo contendere, denying his motion to avoid that order, and overruling his plea in bar, and his counsel argue that the orders challenged, made after his plea of nolo contendere had been accepted, placed him a second time in jeopardy, were in excess of the jurisdiction of the court, and void.

This contention was well answered, and we adopt it as our answer, by Chief Justice Bigelow in delivering an opinion of the Supreme Judicial Court of Massachusetts in Commonwealth v. Weymouth, 84 Mass. (2 Allen) 144, 147, 79 Am. Dec. 776. In that case the defendant on his plea of guilty to an indictment for larceny was sentenced to confinement in the house of correction for two years. A warrant for his commitment was issued, but before he was taken under it the court ordered its execution stayed until a further hearing could be had, and after that hearing it ordered the sentence modified, so as to adjudge his confinement in the state prison for 3½ years. His counsel contended that these proceedings placed the prisoner twice in jeopardy and were void. After adverting to the rule that "the general power of the court over its own judgments, orders, and decrees, in both civil and criminal cases, during the existence of the term at which they are first made, is undeniable." (Ex parte Lange, 18 Wall. [85 U. S.] 163, 167 [21 L. Ed. 872]) Chief Justice Bigelow said:

"He was never taken or charged on the warrant which was issued on the sentence as originally pronounced. That sentence never went into operation, and, in effect, was the same as if it had never been passed. So long as it remained unexecuted, it was, in contemplation of law, in the breast of the court, and subject to revision and alteration. He was not injured or put in jeopardy by it, any further than he would have been by a conclusion or judgment of

the court as to the extent of his punishment, which had not been announced. Until something was done to carry the sentence into execution, by subjecting the prisoner to the warrant in the hands of the officer, no right or privilege to which he was entitled was taken away or invaded, by revoking the sentence first pronounced, and substituting in its stead the one under which he now stands charged."

[8] An examination of the authorities leaves no doubt that the established rule is that courts have the jurisdiction and authority, during the term at which their orders, judgments, and decrees are made, to set them aside and substitute others for them, or to amend or otherwise modify them, until or unless they have been executed in whole or in part, or the rights of third parties will be injured by such action, and cases in which pleas of nolo contendere have been filed and accepted by the court are not exceptions to this rule. Basset v. United States, 9 Wall. (76 U. S.) 38, 39, 41, 19 L. Ed. 548; Tiberg v. Warren, 192 Fed. 458, 460, 461, 463, 112 C. C. A. 596; Ex parte Lange 18 Wall. (85 U. S.) 163, 167, 21 L. Ed. 872; Goddard v. Ordway, 101 U. S. 745, 752, 25 L. Ed. 1040; Bronson v. Schulten, 104 U. S. 410, 415, 26 L. Ed. 797; Ætna Life Ins. Co. v. Board of County Com'rs., 79 Fed. 575, 576, 25 C. C. A. 94. There was no error in the ruling on the orders of the trial court relevant to the plea of nolo contendere.

[9] After the demurrers to the indictment and the plea in bar had been overruled, and the motions recited above had been denied, defendant Stewart made a motion to quash the indictment on the grounds: (1) That the indictment did not "sufficiently present a violation of any of the penal laws of the United States of America, so as to apprise this defendant of the offense with which he stands charged"; and (2) that the indictment was found and returned against the defendant Stewart without any evidence whatever having been submitted to the grand jury tending to prove any offense against Stewart, or to connect him in any way with the offense charged in the indictment. Thereupon evidence was introduced by the counsel for Stewart and by the counsel for the United States upon the issue whether or not the second ground of the motion was sustained by the facts. Upon consideration of this evidence, the court held that it did not sustain that ground, denied the motion, and this ruling is assigned as error.

But there was no reversible error here: (1) Because the grant or denial of a motion to quash an indictment for the absence or incompetency of evidence before the grand jury is, in the federal courts, ordinarily discretionary with the trial court, and reviewable only for an abuse of its discretion, and there was no such abuse here, nor was there any reason for making this case an exception from this general rule. Radford v. United States, 129 Fed. 49, 63 C. C. A. 491; McGregor v. United States, 134 Fed. 187, 192, 69 C. C. A. 477; Livezey v. United States (C. C. A.) 279 Fed. 496, 498; United States v. Rosenberg, 7 Wall. (74 U. S.) 580, 583, 19 L. Ed. 263.

(2) Because an examination and consideration of the evidence on this issue has convinced that it was insufficient to sustain a finding that there was no substantial competent evidence submitted to the grand jury that he was probably connected with and probably guilty of the offense charged in the indictment; and (3) because the first ground

stated for this motion was untenable for the reasons stated earlier in this opinion in the discussion of the demurrers to the indictment.

[10] It is assigned as error that the trial court refused to instruct the jury to return a verdict that the defendant Stewart was not guilty of the offense charged in the indictment. This assignment presents to this appellate court, not the question of the preponderance of the evidence on the issues conditioning the defendant's guilt or innocence, but the question whether or not there was any substantial evidence of a state of facts inconsistent with the defendant's innocence, which excludes every other hypothesis than that of his guilt. Sullivan v. United States (C. C. A.) 283 Fed. 865. The trial of this case occupied 17 days; the evidence, the charge of the court, the requests and exceptions filled 1,120 printed pages of the record. At the close of the evidence the court limited very carefully the questions to be considered by the jury. It charged that the false representations and promises, which were alleged to have been devised and to have been made to induce intended purchasers to buy the lands for amounts greatly in excess of their values, were not made to the parties who purchased these lands by the defendant Stewart personally, and that he did not hear them made to such purchasers by his agents; that the jury could not convict him unless they were satisfied from the evidence beyond a reasonable doubt that he either devised or participated in the devising of the alleged scheme to defraud, of which the making of such false representations was a part, or was knowingly engaged in prosecuting the unlawful enterprise and in causing such representations and promises to be made in furtherance thereof, and that such representations actually were made and were false, and were known by him so to be.

The court further instructed the jury that, if the defendant Stewart acted in good faith in the selling of the lands, did not make or cause the false representations or promises to be made, or if he believed them to be true and had no intention to defraud the purchasers, their verdict must be for the defendant. It further charged the jury in effect that, unless they were satisfied beyond a reasonable doubt from the evidence that one or more of these three representations were made to the persons or some of them alleged to have been intended to be defrauded, they should return a verdict for the defendant Stewart: First, that the lands to be offered for sale to the intended purchasers by the W. E. Stewart Land Company on the Edinburg tract would be irrigated and operated by the Mercedes system of irrigation; second, that the persons intended to be defrauded could and would receive all the water they needed or wanted and when they needed or wanted it for the irrigation of any of the lands bought by the several persons intended to be defrauded from the W. E. Stewart Land Company, and that all they would have to do in order to get it was to telephone the plant for it; third, that the land to be offered for sale to the persons intended to be defrauded by the defendants and the W. E. Stewart Land Company was splendidly adapted to the growing of alfalfa, that an alfalfa crop planted on said lands would be ready to cut the first time within 12 or 14 weeks after planting, that alfalfa grown on said lands in the Rio Grande Valley, where they were situated, can be cut

11 times per year, and that alfalfa can be grown with less care and is worth more in the Rio Grande Valley, where such lands are situated, than in any of the Western or Middle Western States.

Upon the issue whether or not these representations and promises were made, the evidence was conflicting, but there was substantial and sufficient evidence to sustain the finding of the jury that each of them was made to some of the parties who purchased land from the defendants or the W. E. Stewart Land Company on the Edinburg tract, that these representations were false, and that they had the effect to induce the parties intended to be defrauded to part with their money and property for this land, which was worth much less at the time of their purchase than the amounts they paid for it.

[11] Counsel for defendant Stewart, however, earnestly and persuasively argue that there is no substantial evidence that he devised or participated in the execution of this alleged scheme to defraud, or in the causing or making of these false representations or promises. But there is in this record substantial evidence of these facts: For three years prior to August, 1919, defendant Stewart had been engaged in buying and selling large tracts of land in the vicinity of the Edinburg tract. For this purpose he had used the W. E. Stewart Land Company, and by means of that company had sold for about $300 or $400 per acre land under the Mercedes irrigation system, a system which was a completely equipped and efficient system of irrigation, that furnished to the lands sold under it on call an abundance of water for irrigation whenever such water was wanted. The Edinburg tract, out of which the relevant lands in this case were sold by the defendant or his companies, consisted of 10,000 acres of land, and was not provided in 1919 or 1920 with any efficient operative irrigation system. There had been an attempt to construct and operate such a system, but the owners of it had become insolvent, and in August, 1919, the Edinburg tract and its irrigation system had been idle and in the hands of a receiver for three or four years. In this state of the case, Stewart, in August, 1919, contracted to buy this 10,000 acres of land for about $900,000, or $90 per acre. The Edinburg system of irrigation was then and for at least two or three years thereafter unable to supply the necessary water for those who purchased of the defendants lands under it in the years 1919 and 1920, and some of them, after paying one-half cash for their purchases at the price of $300 per acre, clearing some of the land, building houses on it, and moving their families and personal property there, abandoned the land because they could not get water to irrigate it.

Defendant Stewart testified that, immediately after he made his contract to buy this Edinburg tract, he organized the Stewart Irrigated Farms Company, made the defendant C. F. C. Ladd president of that corporation, and set him and that corporation to selling the Edinburg tract at $300 per acre, one-half cash and one-half lien notes, due in from 3 to 5 years. He owned all or the controlling interest in the stock of the W. E. Stewart Land Company and the other corporations mentioned in this case, furnished the officers thereof the necessary stock to qualify them to act as such, selected the officers and agents of the corporation, watchfully directed and superintended what they did, and at pleasure

removed them and appointed others. The Stewart Irrigated Farms Company, under Ladd, sold Edinburg lands until January, 1920, when it was consolidated with the W. E. Stewart Land Company, and thereafter that company made sales out of the Edinburg tract. Immediately after Stewart contracted in August, 1919, to purchase this land, he employed a competent engineer, who examined and reported to him the condition of the Edinburg irrigation system and the repairs and improvements necessary to qualify it to furnish the intended purchasers with the necessary water for the irrigation of their lands, so that from September or October, 1919, he could not have been ignorant of the fact that he could not furnish them with the needed water in 1919 or 1920, if ever, and he could not have been ignorant that this land, which he was selling in the years 1919 and 1920, had no such value as $300 per acre.

The effect of the repeated acts or of the continued course of action of one who causes and is aware of that effect sometimes indicates his knowledge, intention, and purpose. One of the parties alleged to have been defrauded testified that he was a farmer, and had lived and farmed in Kansas for many years; that he was induced to go down into the Rio Grande Valley in Texas about the 1st of January, 1920, on an excursion train in charge of defendant Kirgan, the sales agent of one of Stewart's selling corporations; that on this excursion there were 21 Pullmans; that the excursionists left the train at a siding west of Mercedes; that they were taken over the Rio Grande Valley and then to the Stewart clubhouse, where they had a nice dinner, some music from a Mexican band, and some talks by speakers introduced by defendant Kirgan, one of whom said that they could raise from 9 to 11 cuttings of alfalfa a year; that the next day Kirgan took him and the other excursionists to the Mercedes pumping plant, where the pumps were running, and when they came back they stopped right at the canal, and he told them that there was "our water, all we wanted and when we wanted it," that he then took them out over the valley again, where they saw fine farms and crops; that he did not show them the Edinburg irrigation system, the plant of which was about 20 miles distant from the Mercedes plant, and that the witness never knew anything about the Edinburg system at that time, but that he bought 40 acres on the Edinburg tract for $400 an acre, and paid $8,000 in cash and gave his lien notes for $8,000 for it; that he then plowed, harrowed, and disced the land, and in 1920 ordered water, but could not get any; that he found out, after he got down there in the summer or fall of 1920, for the first time, that this land was under the Edinburg system; that he then went to see it in the month of September, 1920; that it was in bad condition, and the reservoir and canals he saw were partly filled with silt; that he got some water in April, 1921, and after that he ordered water, but it was about three weeks before he got it, and by that time his crops were burned pretty badly, and after the experiences of that summer he moved back to Kansas in September, 1921. Many other witnesses testified to similar experiences and like results.

One of the pamphlets that was freely distributed to the prospective purchasers was called "Big Business of Farming." There was sub-

stantial evidence that its contents were prepared by Mr. Frank Jackson, submitted to Mr. Stewart and Mr. Parker, approved by them, and then published and distributed. That pamphlet contained the statement that:

"The lands owned and controlled by the W. E. Stewart Land Company are lands that are being irrigated and operated under the American Rio Grande Land & Irrigation Company's system of irrigation" (the Mercedes system).

Counsel for Mr. Stewart called attention to the fact that this statement was true when it was made, because the land company was then selling lands on the Mercedes tract. Nevertheless it was false as to all the lands owned and controlled by the W. E. Stewart Land Company on the Edinburg tract, and all the lands relevant to this case were on the latter tract.

In a letter dated April 2, 1920, less than 9 months after Mr. Stewart purchased and commenced to sell this Edinburg tract, signed by the Stewart Farm Mortgage Company, W. E. Stewart, president, and addressed to D. E. Kirgan, one of the defendants, Stewart wrote among other things, that it was his most earnest desire that Kirgan should see to it "that those lands that we have purchased and own under the Edinburg Canal are sold at the earliest possible date"; that "I desire to sell the Edinburg irrigation system to the farmers, and I think they desire to buy it"; and that, "so long as we have charge of the irrigation system there, we are going to have to put a great deal of money into it." Mr. Stewart testified that at this time, April 2, 1920, he had expended about $60,000 to buy four pieces of machinery to be used in the Edinburg irrigation system, and that subsequent to that date he spent in repairing that old system $383,792.

In view of the substantial evidence that defendant Stewart knew the character and inefficiency of the Edinburg system in the fall of 1919 and throughout 1920, when these lands were being sold by his companies and agents at $300 to $400 an acre, and must have known that the purchasers could not during those years get the necessary water to irrigate these lands, that he was the practical owner of the corporations, manned them, inspired, directed, watched, and supervised their action and the action of their agents, that he must have planned to get and did get from the purchasers about $150 an acre in cash for the lands sold before they could be irrigated, and before the purchasers knew the character of the Edinburg system, that he was in great haste to sell the lands and the inefficient irrigation system, and to close them all out in April, 1920, and get the $150 per acre before he had repaired the irrigation system, so that it was of substantial use, and before the purchasers generally had learned the situation they were in, the condition of the Edinburg irrigation system, and the small value of the lands under it, in view of the character of that system, and in view of many other facts and circumstances evidenced by the record, which we do not stop to recite, we are unable to reach the conclusion that there was not before this jury substantial evidence of the facts necessarily found by it under the charge of the court, or that those facts were not inconsistent with the innocence of Mr. Stewart, or did not exclude every other hypothesis than that of his guilt, so that our conclusion is

that the denial of the defendant's request for an instruction to the jury to acquit him was right.

[12] On February 27, 1923, the trial ended and the jury retired. On the next day they were ordered into court; the foreman informed the court that they had not agreed and that the subject of their disagreement was the facts. Thereupon the court said to the foreman that it did not wish him to say how the jury stood, but that it would like to know whether they were evenly divided, or whether there was a larger preponderance one way or the other, and the foreman answered that there seemed to be a large preponderance one way. Thereupon the court stated to the jury it did not desire to influence them in regard to their verdict, but to emphasize the fact that, if they could consistently and by consultation reach a verdict, that result would be very desirable; that it thought it could do no better than to read them the expression of the views of the Supreme Court in a similar situation, and thereupon it read to them this extract from the opinion of that court in Allen v. United States, 164 U. S. at page 501 (17 Sup. Ct. 154, 157, 41 L. Ed. 528):

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

And the court then said:

"Now, gentlemen, that is addressed to your judgment and conscience in the matter, and the court would like for you to retire and make an earnest effort to see if you can agree in this case. You may retire."

To the court's inquiry whether the jury was evenly divided, or whether there was a larger preponderance one way or the other, and to this supplemental charge, the defendant Stewart excepted.

In the celebrated case of Burton v. United States, 196 U. S. 283, 305, 306, 25 Sup. Ct. 243, 249 (49 L. Ed. 482) after the jury had been out from Saturday evening until the following Monday morning, they returned into court without agreeing, and the court gave them a supplemental charge in which it said, among other things: ' ,

"I would like to ask the foreman of the jury how you are divided. I do not want to know how many stand for conviction, or how many for acquittal, but to know the number who stand the one way, and the number who stand another way. I would like the statement from the foreman."

The foreman answered, "Eleven to one." Thereupon the court said:

"The jury stand eleven to one. I gather that from the communication. In the light of that fact I feel constrained to make a statement to you, and in making it to use the language of the Supreme Court of the United States as found in Allen v. United States, 164 U. S. 492."

The court then charged the jury in relation to its duty to agree if possible, and directed that the jury should, in the light of the comments of the court then made, retire and make a serious attempt to arrive at a verdict in the case. 196 U. S. 305 (25 Sup. Ct. 250). The Supreme Court, after discussing another question and declaring that, "balanced as the case was in the minds of some of the jurors, doubts existing as to the defendant's guilt in the mind of at least one, it was a case where the most extreme care and caution were necessary in order that the legal rights of the defendant should be preserved," and that "a slight thing may have turned the balance against the accused under the circumstances shown by the record," said:

"That a practice ought not to grow up of inquiring of a jury, when brought into court because unable to agree, how the jury is divided, not meaning by such question, how many stand for conviction or how many stand for acquittal, but meaning the proportion of the division, not which way the division may be. Such a practice is not to be commended, because we cannot see how it may be material for the court to understand the proportion of division of opinion among the jury. All that the judge said in regard to the propriety and duty of the jury to fairly and honestly endeavor to agree could have been said without asking for the fact as to the proportion of their division, and we do not think that the proper administration of the law requires such knowledge or permits such a question on the part of the presiding judge." 196 U. S. at pages 307 and 308 (25 Sup. Ct. 250).

The first question presented by the exceptions to the supplemental charge and the question to the jury is whether it was a violation of the rule established by the opinion of the Supreme Court, from which we have quoted, for the court below, after the jury had deliberated from one day to the next and failed to agree, and after the court had told the foreman of the jury that it did not wish him to say how the jurors stood, to ask him whether they were evenly divided, or whether there was a larger preponderance one way or the other, and thereby to elicit the answer that there seemed to be a large preponderance one way. This inquiry certainly seems, upon a first comparison of it with the practice described and condemned in the opinion in the Burton Case, to fall directly under the ban of the decision in that case. The practice which the Supreme Court there declared ought not to grow up was the practice "of inquiring of a jury * * * how the jury is divided; not meaning by such question, how many stand for conviction, or how many stand for acquittal, but meaning the proportion of the division, not which way the division may be." 196 U. S. 307 (25 Sup. Ct. 250). And that court further said that:

"All that the judge said in regard to the propriety and duty of the jury to fairly and honestly endeavor to agree could have been said without asking for the fact as to the proportion of their division; and we do not think that the proper administration of the law requires such knowledge or permits such a question."

The practice forbidden by this opinion seems to be any inquiry "as to the proportion of the division" of the jury, although "not meaning by such question how many stand for conviction or how many stand for acquittal, but meaning the proportion of the division, not which way the division may be." It is difficult to describe the question asked by the court below more clearly and accurately than it is described by

this language of the Supreme Court. It was exactly an inquiry how the jury was divided, not meaning how many stood for conviction, or how many stood for acquittal, but meaning the proportion of the division, not which way the division was. While in questions of this nature, which exclude inquiries and answers as to the standing of the jury in regard to the conviction or acquittal of the accused, such as the question asked in this case, and such as, Is there a preponderance of jurors one way or the other? Is there a great preponderance of jurors one way or the other? Is there an overwhelming preponderance of jurors one way or the other? Courts and juries use the word "preponderance," they actually think and mean majority, and they think of and seek for the numerical proportion of the division of the jury.

This court had occasion to consider the true construction and effect of the opinion of the Supreme Court in the Burton Case, relative to the question now under consideration, in St. Louis & S. F. R. Co. v. Bishard, 147 Fed. 496, 500, 501, 502, 78 C. C. A. 62, and concluded that the trial court's inquiry of the jury in that case, not how many were for conviction or how many were for acquittal, but what the bare proportion of their division was, was erroneous, reversed the judgment, and ordered a new trial. There is no such difference between the facts in that case and the facts in the case in hand as will warrant a contrary result in this case.

The fact has not escaped our attention that in Quong Duck v. United States, 293 Fed. 563, 564, the Circuit Court of Appeals for the Ninth Circuit expressed the opinion, although it did not base its judgment on its ruling upon this point, that while the practice of asking a jury how it is divided numerically is not to be approved, nevertheless, where such question is expressly limited to the ascertainment of the proportion of the division, and expressly excludes any question of what the proportionate division is as to the guilt or innocence of the defendant, it does not fall under the ban of the decision and opinion in Burton's Case, and the asking and answering thereof is not prejudicial to the defendant. But the question asked, decided to have been erroneously asked and condemned, in Burton's Case, was expressly limited to the ascertainment of the proportion of the division, and it expressly excluded any question of what the proportionate division as to the guilt or innocence of the defendant was. That question was:

"I would like to ask the foreman of the jury how you are divided. I do not want to know how many stand for conviction, or how many for acquittal, but to know the number who stand one way and the number who stand another way." 196 U. S. 305 (25 Sup. Ct. 249).

In view of this fact and of the other reasons for our conclusion, which have been stated above, we are unable to bring our minds to a concurrence with the view of the question here at issue, expressed by the eminent and respected judges of the Ninth Circuit. In view of the express and clear declaration of the Supreme Court in its opinion in the Burton Case that the proper administration of the law does not permit an inquiry of the jury by the presiding judge how it is divided, "not meaning by such question, how many stand for conviction or how many stand for acquittal, but meaning the proportion of the division,

not which way the division may be" (196 U. S. 307, 308 [25 Sup. Ct. 250]), and of the fact that the inquiry made of the foreman of the jury by the court below clearly asked such a question, there is to our minds no rational or logical way of escape from the conclusion that there was error in asking that question and eliciting its answer. In our opinion the better and safe way for the presiding judge to proceed is for him to avoid asking any question of the jury or of its foreman as to the standing of the jury or the proportion of their division upon any issue, after that issue is submitted to them for decision, until after their verdict has been rendered or they have been discharged.

[13] The second question presented by the exceptions now under consideration here is: Was the supplemental charge and the reading of the excerpt from the opinion of the Supreme Court in Allen v. United States error? The excerpt from that opinion was not any part of the charge to the jury in that case, nor did the Supreme Court recommend that excerpt as a fit charge to the jury under such circumstances as existed in that case or in this. The supplemental charge to the jury under like circumstances in Allen's Case was "taken literally from a charge in a criminal case which was approved of by the Supreme Judicial Court of Massachusetts in Commonwealth v. Tuey, 8 Cush. 1, and by the Supreme Court of Connecticut in State v. Smith, 49 Connecticut, 376, 386." 164 U. S. 501 (17 Sup. Ct. 157). It was in substance the same charge which, under like circumstances, was given to the jury in United States v. Allis (C. C.) 73 Fed. 165, 182, which was sustained by the Supreme Court in Allis v. United States, 155 U. S. 117, 123, 15 Sup. Ct. 36, 39 L. Ed. 91, and which received the approval of this court as stating "the proper limitation of the authority of a trial court when a jury is having difficulty in reaching a verdict," in St. Louis & S. F. R. Co. v. Bishard, 147 Fed. 496, 500, 78 C. C. A. 62. If the court below had given that charge, it would have avoided the question now under consideration. That charge contained these statements:

"The court does not desire that any juror should surrender his conscientious convictions. On the other hand, each juror should perform his duty conscientiously and honestly, according to the law and the evidence. And although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusions of his fellows, yet, in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other."

Compare these statements with those relating to the right and duty of each individual juror to render a verdict according to his own conscientious convictions with these on this subject in the supplemental charge and in the excerpt read to the jury below, "Of course, you are to understand that the court desires in no wise to influence you at all in respect to a verdict but simply to emphasize the fact that if you can consistently and by consultation with each other reach a verdict, * * * and if a verdict can be conscientiously arrived at, it is highly desirable," and in the excerpt from the opinion of the Supreme Court in the Allen Case, which was read to the jury by the court below, and which it told them was addressed to their judgment and conscience, and

300 F.—50

then directed them to retire and make an earnest effort to see if they could agree in the case, to wit:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

This paragraph of the opinion in Allen's Case, as we have said, was no part of the charge of the court in that case, but it was a part of the argument of the Supreme Court in support of the standard and approved charge in that case, and it was intended to show the absurdity of a stubborn refusal by a juror to listen to the arguments of his fellows, or to consider anything but the conclusion he had reached before the jury retired to deliberate. There was no evidence in this case that any juror had not listened with deference to the arguments of the majority, or that any juror went to the jury room with a blind determination that the verdict should represent his opinion of the case at the time he entered that room, or that any juror had closed his ears to the arguments of men who were equally honest and intelligent with himself. The legal presumption was and is that each juror had listened deferentially to and considered the arguments of those who differed with him, and thereafter had conscientiously formed and expressed his honest conviction and judgment upon the issues submitted to them, and, while the excerpt from the opinion in Allen's Case was a proper and persuasive argument for the standard and approved charge under such circumstances, it so slightingly treated the positive duty of each juror to form and to make his verdict express his own honest conviction, based on the evidence in the case, and so forcibly urged deference to the views of the majority and unanimity, that we are unable to resist the conviction that it tended too strongly toward coercion of the minority of the jury to surrender their honest convictions in order to acquiesce in the convictions of the majority. As was said by Judge Hook of the charge in St. Louis & S. F. R. Co. v. Bishard, 147 Fed. 502, 78 C. C. A. 62, the charge itself was not sufficiently guarded; its tendency was to bring the minority to an agreement with the others, even against the dictates of their own judgment.

The jury in this case had deliberated many hours and had disagreed. There was at least one juror, perhaps more, that was convinced that the defendant was not guilty. The crucial questions in this case were questions of fact, that it was peculiarly the duty of the jury to consider and decide, among other things, the intention, the knowledge, the belief, the purpose, and good faith of the defendant Stewart. Much of the evidence on these questions was circumstantial; the testimony upon them was conflicting. The jury had disagreed. They received the supplemental charge from the court, retired, and in a short time returned with a verdict of guilty. As was said by the Supreme Court

in Burton's Case, "A slight thing may have turned the balance against the accused under the circumstances shown by the record" (196 U. S. 307 [25 Sup. Ct. 250]), the supplemental charge and especially the excerpt from the opinion in Allen's Case were more than a slight thing, and our conclusion is that they bore too hard upon the convictions of the minority of the jury, and that an impartial and fair administration of justice will be served by a new trial of this case.

[14] On March 13, 1923, counsel for Mr. Stewart made a motion for a new trial on 49 separate and specific grounds. They now assign as error the action of the court on the forty-ninth ground, which was: First, alleged misconduct of some of the jurors in their room during their deliberation regarding their verdict after the case had been submitted to them, in that some of them said that the defendant had filed a plea of nolo contendere, and had admitted his guilt and thrown himself upon the mercy of the court; that one of the jurors said that he had two neighbors that had been fleeced in Texas land frauds by the W. E. Stewart Company; that one of the jurors said, What will your neighbors think of you if you vote to acquit? That none of these things were in the evidence that had been produced before them; and that they discussed these things and many others not relevant to the issue, whether the evidence established the guilt or innocence of the defendant beyond a reasonable doubt. But the only evidence of these things was the affidavits of eight of the jurors, and there was no evidence that any of the acts of which complaint was made were caused by any acts or interference of anyone not a member of the jury. And, second, the alleged publication during the trial at Kansas City, Mo., where the trial was conducted, by newspapers, of articles adverse to the defendant Stewart, the only proof of which was excerpts therefrom proved by affidavit to have been published, without any proof that these excerpts were read by any of the jury, or that they had any influence upon them in reaching their verdict.

When counsel for defendant Stewart made this motion for a new trial, the first 48 grounds for it were alleged errors in the proceedings before the jury retired to find its verdict, with which the court was familiar, and counsel for the defendant offered the affidavits of the jurors and the excerpts from the newspapers and proof of their publication, without proof that any of the jurors had read them or was influenced by them, in support of the averments of the forty-ninth ground for the new trial. The court received in evidence the affidavits of the jurors and the affidavit of the publication of the excerpts and the excerpts themselves, and without reading the motion for new trial or the affidavits or the excerpts from the newspapers, it said:

"Just let them be marked hereafter. We will not take up the time now. The motion is overruled."

Thereupon counsel for Mr. Stewart excepted to this ruling on the ground that the motion was overruled by the court without looking at or considering either the motion, the affidavits, or the excerpts from the newspapers, and that this action was an abuse of the court's discretion. The court then proceeded to pronounce sentence upon several of the defendants in this case, who had filed pleas of nolo con-

tendere, and when this had been done this colloquy occurred between the court and Mr. Brewster, the leading counsel for the defendant:

"The Court: Mr. Brewster, the court understood that those affidavits you introduced were in support of this last assignment?

"Mr. Brewster: Yes.

"The Court: As to what took place in the jury room?

"Mr. Brewster: Yes, sir.

"The Court: The court did not examine them, for the reason the court is of the opinion that it is improper to inquire of the jury as to what actuated them. It was not necessary. I understand you made the objection there that the court did not read your affidavits.

"Mr. Brewster: Well, yes; I did.

"The Court: And disregarded them.

"Mr. Brewster: Yes.

"The Court: Well, the court did not read them for that reason; that it understood what they referred to; and it is aware of what the motion for a new trial sets up, and that would be incompetent in any event. Otherwise, we might try every case over by what a jury might think afterwards. I think I read all the newspapers, so it is not necessary for me to reread them.

"Mr. Brewster: Now, as to the last position of the court, that it is improper to show what we have attempted to show by the affidavits of the jurors, of course, we save an exception to that position and ruling of the court."

[15] We have read and deliberately considered the affidavits of the jurors and the proof as to the excerpts from the newspapers, and have no doubt that there was no error prejudicial to the defendant in the rulings or acts of the court in relation to them. The jurors were incompetent to prove the alleged facts stated in their affidavits under the established rule of public policy, nowhere more clearly or accurately stated than by Chief Justice Bigelow in 1860 in Capen et al. v. Stoughton, 16 Gray (82 Mass.) 364, 366, in these words:

"It has been settled upon sound considerations of public policy that mistake of the testimony, misapprehension of the law, error in computation, irregular or illegal methods of arriving at damages, unsound reasons, or improper motives, misconduct during the trial or in the jury room, cannot be shown by the evidence of the jurors themselves, as the ground of disturbing a verdict, duly rendered."

This ruling has been adopted by the Supreme Court of the United States and the other federal courts. McDonald v. Pless, 238 U. S. 264, 268, 35 Sup. Ct. 783, 59 L. Ed. 1300; Stout v. United States, 227 Fed. 799, 804, 142 C. C. A. 323. The affidavit of the publication of the excerpts from the newspapers and the excerpts themselves were immaterial, without evidence other than that of the jurors tending to show that they were read by the jurors, and the receipt of the affidavits of the jurors and of the excerpts from the newspapers in evidence and the grant of a new trial on account of them would have constituted both error of law and an abuse of the discretion of the court.

[16] In our opinion, the record, which we have set forth above, does not fairly show that the court refused to exercise its discretion to grant a new trial. The second colloquy on the subject was on the same day as the first, and it indicates to us that the fact was that the court denied the motion on the ground that there was no competent evidence to invoke the exercise of its discretion. If, however, in this we are mistaken, the action of the court was not prejudicial to the defendant, and error without prejudice is no ground for a reversal.

[17] There was no error in the refusal by the court of defendant Stewart's request to charge the jury that they could not convict him, unless they believed beyond a reasonable doubt that employees of the Stewart Land Company or of the Irrigated Farms Company falsely stated and represented to prospective land purchasers upon the Edinburg tract that said tract was in fact watered or would be watered under what was known as the Mercedes system, nor unless they believed and found from the evidence, beyond a reasonable doubt, that such false representations, if any, were made with the knowledge and consent of the defendant W. E. Stewart. There was substantial evidence of false representations and promises by employees of those companies to purchasers of land on the Edinburg tract that they would receive all the water they needed for the irrigation of the lands they bought from those companies, when they wanted or needed it, and, if the jury believed from the evidence beyond a reasonable doubt that these representations and promises were made with Stewart's knowledge and consent, that they were false, and he knew it, the jury would have been warranted in convicting him, although those representations and promises were not accompanied with the false statement that the lands so sold would be irrigated by the Mercedes system. The requested instruction singled out one of the several misrepresentations charged to sustain others of which there was substantial evidence, and directed the jury to return a verdict for the defendant, unless they were satisfied beyond a reasonable doubt that that particular representation had been made with the defendant's knowledge and consent, when there were other representations of which there was substantial evidence to convict him. Weddel v. United States, 213 Fed. 208, 210, 129 C. C. A. 552.

[18] The testimony of Mr. Palis, a witness for the United States, fills 10 printed pages of the record and relates to several subjects. In his direct examination he testified, among other things, that there was a guard house and a guard at the entrance to the Stewart Clubhouse in Hidalgo county, Tex., in 1919 and 1920, to take care of people entering; that any one coming there just to kill the business was not permitted to enter; that people favorable to the business and to the country were allowed to do so; and that the prospects or people assembled and kept there at the clubhouse for the purpose of selling land to them were not shown around and permitted to go where they wanted to—to the town of Mercedes and other places. On his cross-examination, counsel for Mr. Stewart asked the witness and he answered many questions relative to the method of conducting the excursions of these prospects, and then moved to strike out the testimony of the witness that they were kept so they could not see people, on the ground that that was a conclusion not based upon the facts. The court denied this motion and counsel complains of that ruling. But the issue to which the ruling assailed was pertinent was a question of fact; that testimony was competent and material under the pleadings, and its effect was not indisputable. It was therefore a question for the jury, and not for the court, and there was no error in the refusal to strike it out.

Let the judgments and sentences on all the counts of the indictment be reversed, and let the case be remanded to the court below with directions to grant a new trial.

REEVES, District Judge (dissenting in part). In the lucid and exhaustive opinion of the learned presiding judge, I most heartily concur, except to that portion covering the question of the supplemental charge of the trial judge and the results of the case. I respectfully dissent from the views expressed on the supplemental charge, and necessarily from the result. Upon the supplemental charge only, and the inquiry made in connection therewith, is a reversal of the whole case based.

I do not believe that reversible error should be predicated upon the inquiry that was made of the jury, after it had expressed difficulty in reaching an agreement, and upon the additional charge given by the court. In support of my conclusions in the premises, I submit the following legal principles not in controversy:

1. It was proper for the trial court to recall the jury for further instructions after they had been in deliberation for a considerable length of time.

"It is a familiar practice to recall a jury after they have been in deliberation for any length of time, for the purpose of ascertaining what difficulties they have in the consideration of the case, and of making proper efforts to assist them in the solution of those difficulties. *It would be startling to have such action held to be error, and error sufficient to reverse a judgment.* The time at which such a recall shall be made, if at all, must be left to the sound discretion of the trial court." Allis v. United States, 155 U. S. 117, loc. cit. 123 (15 Sup. Ct. 36, 39 L. Ed. 91).

2. It is not only the right, but it is the duty, of the trial judge, after a lengthy deliberation of the jury has been unavailing, to aid the jury by declaring the law covering the particular difficulties that may seem to confront the jury. Allis v. United States, supra; Allen v. United States, 164 U. S. 492, loc. cit. 501, 17 Sup. Ct. 154, 41 L. Ed. 528; United States v. Allis (C. C.) 73 Fed. 165, loc. cit. 182.

3. In declaring the law in a supplemental charge to the jury, undoubtedly the court should know something of the difficulties encountered by it, as otherwise the court would not know what legal principles to enunciate as applicable to the facts in the case. Under such circumstances the court may guardedly make such inquiries of the jury as may aid in "ascertaining what difficulties they have in the consideration of the case, and of making proper efforts to assist them in the solution of those difficulties."

4. It is the law that:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his

opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself." Allen v. United States, 164 U. S. 492, loc. cit. 501 (17 Sup. Ct. 157, 41 L. Ed. 528.

This law should not ordinarily be declared to the jury until a situation arises requiring it, and such a situation in the instant case arose when the jury had failed to agree, and this was true in all the cases cited in the majority opinion. United States v. Allis (C. C.) 73 Fed. 165, loc. cit. 182; St. Louis & San Francisco R. R. Co. v. Bishard, 147 Fed. 496, loc. cit. 500–501, 78 C. C. A. 62; Allis v. United States, 155 U. S. 117, loc. cit. 123, 15 Sup. Ct. 36, 39 L. Ed. 91; Allen v. United States, 164 U. S. 492, loc. cit. 501, 17 Sup. Ct. 154, 41 L. Ed. 528; Burton v. United States, 196 U. S. 283, loc. cit. 305, 306, 307, 25 Sup. Ct. 243, 49 L. Ed. 482; Quong Duck v. United States (C. C. A.) 293 Fed. 563.

5. The primary question here is whether the trial judge should be convicted of error for the method employed in "ascertaining what difficulties" confronted the jury. When the jury was recalled, the following colloquy between the court and the foreman of the jury occurred:

"The Court: Gentlemen, have you been able to arrive at a verdict?

"The Foreman: We have not yet, your honor.

"The Court: Is there anything in the way of misunderstanding of the issues that the court can help you upon, or is it just a matter of disagreement upon the facts?

"The Foreman: It seems to be a disagreement upon the facts.

"The Court: Mr. Foreman, the court does not wish you to say how you stand, but I would like to know if you are evenly divided, or whether there is a large preponderance one way or the other.

"The Foreman: There seems to be a large preponderance one way."

Thereupon the court gave the supplemental charge set forth in the majority opinion. It is to be noted that the court did not seek to ascertain how the jury stood, or the numerical proportion of the jury, but sought the sole information, "if you are evenly divided, or whether there is a large preponderance one way or the other." The court was entitled to know this, in view of the pronouncements of the Supreme Court, so that proper efforts might be made "to assist them in the solution of those difficulties." In the case of United States v. Allis, supra, the main and supplemental charge of the court is reported. The able jurist, who presided in the trial of that case, is the learned author of the majority opinion in this case. The charge in the Allis Case was so clear, accurate, and complete, and so easily understood, that it has been published as a model of judicial clarity and accuracy. The following from the supplemental charge in that case is apposite:

"But, in conferring together, you ought to pay proper respect to each other's opinions, with a disposition to be convinced by each other's arguments. And, on the one hand, *if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one, which makes no impression upon the minds of so many men, equally honest, equally intelligent, with himself, who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath."*

This charge was approved in Allis v. United States, supra. Wherein did the court err in the inquiry propounded solely for the purpose

of determining the applicability of this law? Assume that the court had not made the inquiry, but had simply declared the law; is it not reasonable to believe that the jury in their own minds would have immediately made even the numerical proportion? They knew the exact standing of the jury numerically. The minority of the jury would necessarily feel the force of the charge to the same extent, and no further, than if, in giving the charge, the court had been authentically informed that there was a majority and a minority. If it might seem, as intimated in the Burton Case, to be an embarrassment and a coercion to a minority because the court knew the exact number of the minority, yet such a situation does not exist in this case. The court did. not know the number, but only that there was a large preponderance one way. The instant case does not fall under the ban of either the civil case, cited in the majority opinion, St. Louis & San Francisco R. Co. v. Bishard, supra, nor the well-known case of Burton v. United States. In the former, the case was tried to 11 jurymen. The jury failed to agree, and, upon being recalled, the court propounded such an inquiry as to elicit the information that they stood 10 to 1, whereupon the court said:

"The juror who is standing out against the other 10 should listen to their arguments, and should try and look at the case from their viewpoint."

Clearly this was wrong as it was an unguarded statement, and could not be sustained upon any theory. The difference between that case and the one under consideration is so marked that it gives no aid here. It is not analogous. In the Burton Case, chiefly relied upon in the majority opinion, the jury was recalled after a lengthy deliberation. The court desired "to know the number who stand the one way and the number who stand another way," and was informed by the foreman of the jury that they stood "eleven to one." Whereupon the court said:

"*The jury stand 11 to 1. * * * In the light of that fact* I feel constrained to make a statement to you, and in making it to use the language of the Supreme Court of the United States as found in Allen v. United States."

Concerning this inquiry, the court said:

"That a practice ought not to grow up of inquiring of a jury, when brought into court because unable to agree, how the jury is divided. * * * Such a practice is not to be commended, because we cannot see how it may be material for the court to understand the proportion of division of opinion among the jury."

The court, in using the above language, did not have in mind the language of the instant case as to whether there was a preponderance one way or the other, but had in mind the inquiry that elicited the information that the jury stood 11 to 1. So far as may be known in the case at bar, the jury may have stood 8 to 4 or 9 to 3. In either case it could have been characterized as a large proportion one way. Furthermore, in the Burton Case, the court as a premise to its supplemental charge said:

"The jury stand 11 to 1. * * * *In the light of that fact* I feel constrained to make a statement to you. * * *"

This, of course, did expose the one dissenting juryman to the court, though not by name. The psychology of the situation was to present one man as holding out against the other 11, and "in the light of that fact" the court charged the jury, and the lone juryman doubtless felt that the entire charge was directed at him. Neither is that case analogous here. Even if the court had so charged, without making the inquiry, the jury would have known that only one man was dissenting, and the 11 doubtless would have argued that the charge applied specifically to the lone juryman. According to the majority opinion, this would have been proper. The criticism in the Burton Case was directed against the *court's* knowledge of the exact number in giving the charge. Moreover, the Burton Case was not reversed because of the inquiry and the supplemental charge. The court merely criticized the practice. That case was reversed because the court refused to indicate to the jury that certain requested instructions read to the jury "were just as much a part of your honor's charge as that which the court read as emanating from the court itself," and all the language quoted from the Burton Case in the majority opinion directly referred to this action of the court, and did not refer in any way to the supplemental charge and the inquiry preceding it.

As to the supplemental charge itself, it is argued that the excerpt from the opinion in the Allen Case "was not any part of the charge to the jury in that case, nor did the Supreme Court recommend that excerpt as a fit charge to the jury under such circumstances as existed in that case or in this." By referring to the opinion, it is to be noted that the court did not even criticize the charge, but tacitly approved it in the following language:

"All that the judge said in regard to the propriety and duty of the jury to fairly and honestly endeavor to agree could have been said without asking for the fact as to the proportion of their division."

The inquiry and the charge that followed in this case were both characterized by care and caution. The jury were specifically admonished:

"That the court desires in no wise to influence you at all in respect to a verdict, but simply to emphasize the fact that, if you can consistently and by consultation with each other reach a verdict, it is highly desirable."

The entire record reflects an attitude of commendable fairness and impartiality on the part of the trial judge. At this stage of the proceeding the jury must have been impressed with that fairness. No juryman could have felt himself coerced by the court's charge. Convinced as I am that the rights of plaintiff in error were in no way prejudiced by the inquiry and supplemental charge, and that he has had a fair trial, it is my opinion that the judgment and sentence of the trial court should be affirmed, save only as to counts 15 and 16.

I concur in a reversal as to these counts.