### ST. LOUIS & S. F. R. CO. v. BISHARD.

(Circuit Court of Appeals, Eighth Circuit. July 30, 1906.)

No. 2,286.

1. RAILROADS—NEGLIGENCE OF COMPANY—CONSTRUCTION OF TRACK.

The fact that a passing track at a railroad station was not so constructed as to take a rapidly moving train in safety is not of itself proof of the company's negligence, where it was sufficient for the use for which it was intended and safe for the passage of trains under control and moving slowly.

2. MASTER AND SERVANT—ACTION FOR DEATH OF SERVANT—CONTRIBUTORY NEGLIGENCE.

A railroad passenger train, moving at a speed of 55 miles an hour in the night, ran upon a side track at a station, which had been connected for the passage of trains owing to an obstruction on the main track near the station, but which was unsafe for the passage of trains at such speed, and was wrecked, the engineer and fireman being killed. In an action to recover for the death of the fireman, it was shown that those on the train had not been notified of the obstruction on the main track, and a flagman, sent back to warn approaching trains, negligently failed to perform his duty. There was a switchstand at the junction of the two tracks carrying a lamp, which showed a red light to approaching trains when the passing track was connected; but whether such lamp was lighted was in dispute. Among the duties of the fireman was that of keeping a lookout for signals at stations. *Held*, that the court properly refused to direct a verdict for defendant, or to charge the jury that it was the paramount duty of deceased to keep such lookout and to warn the engineer either of the red light or the absence of a light at the switch, and if he failed in such duty he was guilty of contributory negligence, and correctly charged that it was his duty to keep such lookout if not otherwise necessarily engaged; the requested instruction being further inapplicable because there was no evidence to show whether deceased did or did not perform such duty, and he was not chargeable under the state statute with the negligence of his fellow servant.

[Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Master and Servant, § 1122.]

3. TRIAL—RECALLING JURY FOR FURTHER INSTRUCTION—LIMITS OF COURT'S AUTHORITY.

While it is within the discretion of a trial judge to recall a jury, after they have been in deliberation for a considerable time without reaching an agreement, for inquiry as to their difficulty and for further instruction

if deemed advisable, it is not permissible to inquire of them in what proportion they are divided. and any instruction in respect to their duty to agree if possible should be carefully guarded, so as not to unduly press such duty upon the minority.

[Ed. Note.—For cases in point, see vol. Cent. Dig. Trial, § 747.]

In Error to the Circuit Court of the United States for the District of Kansas.

This was an action under a Kansas statute by Augusta Bishard, as administratrix, to recover damages of the railroad company for the death of her husband, alleged to have been caused by its negligence and that of its employés. The plaintiff had judgment in the trial court, and the railroad company prosecuted this writ of error.

James Black (L. F. Parker and W. F. Evans, on the brief), for plaintiff in error.

J. I. Sheppard and A. M. Keene, for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. The plaintiff's intestate was a locomotive fireman and at the time of his death was in the service of the railroad company upon a passenger train called the "Meteor." About 5 o'clock in the morning of December 21, 1903, the Meteor, north-bound, was wrecked near Godfrey, a small station in Kansas, and the fireman and engineer were killed. The contention of the company that the trial court should have directed a verdict in its favor requires a consideration of the conditions surrounding the accident. We may say, however, without reciting all of the evidence, that it was abundantly sufficient to establish negligence on the part of the employés of the company and that the case turns more particularly upon the question whether the fireman was himself guilty of negligence contributing to his death.

The station house at Godfrey is on the west side of the main track. There was no telegraph operator or agent there in the nighttime. To the eastward of the main track is a passing track about 2,000 feet in length, which connects with the main track about 1,200 feet south of the station. There is also a connection at the north, but with this we have little concern as the wreck occurred near the other end. At the south connection there is a switch stand about 6 feet east of the main track surmounted by a lamp which, when lighted, shows green on two opposite sides, and red, the usual signal of danger, on the other two. The mechanism is so arranged that when the switch is thrown to let a north-bound train from the main track onto the passing track the lamp shows red northward and southward. The lamp is between 7 and 8 feet above the ties. Commencing near the south end of the station the main track curves to the westward for nearly a half of a mile. During the night and several hours before the accident occurred a north-bound freight train with a leaking engine became stalled upon the main line a short distance north of the station, and it became necessary that trains running in either direction should use the passing track to avoid the blockade. The duty therefore devolved upon the trainmen of the stranded train to advise the other trains

147 F.—32

of the situation by appropriate signals. Several trains made the passage in safety. The Meteor, north-bound, was running under special orders which required it to maintain a speed of about 55 miles an hour. Those in charge of it were not advised by telegraphic orders of the obstruction at Godfrey. The passing track was not designed or so constructed as to take a rapidly moving train in safety. It was clearly insufficient for such traffic and hence the necessity of warning signals to other trains including the Meteor. We may at this point say that we do not regard the physical condition of the passing track, concerning which considerable testimony was given, as in itself primary evidence of the negligence of the company. It seemed to be sufficient for its ordinary use as a passing track for trains under control or moving slowly. Its structure, however, was one of the conditions of the situation, and the negligence of the company consisted, so far as this case is concerned, in allowing the Meteor, running under special orders at a high rate of speed, to run on to the passing track without sufficient warning of the thrown switch. A rule of the company, applicable to such an emergency, required the conductor of the stranded freight train to send a flagman back with stop signals, and it was the duty of the flagman to place torpedoes upon the rail at certain distances from the point of danger. There was sufficient proof of quite a satisfactory character that the flagman who was sent back wholly neglected to perform this duty and also proof that he did not otherwise warn the engineer and fireman of the approaching Meteor. There was evidence tending to show that the lamp at the switch stand was not lighted at the time of the accident; also that it had not always theretofore been kept burning in the nighttime. The Meteor, approaching from the south at high speed, took the passing track at the switch and the wreck occurred; the engine being derailed when it had proceeded about 90 feet from the point of entrance.

The company claims that, as the switch was thrown for the passing track, the lamp, if burning, must have shown the red sign of danger, and that if it was not burning when the Meteor approached, the mere absence of a light at that customary place was in itself a sufficient warning under a rule of the company to that effect. Here arises the principal contention of contributory negligence on the part of the fireman. It is said that it was his duty, especially in approaching stations, to keep a lookout for signals, and that as his train was moving on the curve his position on the west side of the engine would have enabled him to look along the chord of the arc and to detect either the presence of the red light at the switch stand or the absence of any light as the case may have been, and that in either event it was his duty to immediately notify the engineer of the result of his observations. Counsel for the company requested the trial court to charge the jury that it was the paramount duty of the fireman to keep this lookout and to warn the engineer in time to avoid the danger, and that if he could have seen the signal in time to warn the engineer and did not keep the lookout, then the verdict should be for the defendant. The request was denied. The trial court in lieu thereof

charged the jury that it was the duty of the fireman to keep the lookout when not otherwise necessarily engaged. We are of the opinion that the trial court was right. There were other important and imperative duties which the fireman was required by the rules of the company and the nature of his position to perform. Those rules expressly placed him under the supervision and direction of the engineer and required him to obey the orders of the latter respecting the performance of his duties. In keeping a lookout on the track for signals he was merely an assistant acting under the direction of the engineer, and it cannot be said that upon the occasion in question it was his paramount duty to be on the lookout at any particular moment. The rules did not so provide, and we cannot infer that the engineer so ordered. Other duties of moment may have demanded his attention elsewhere. Having due regard to that presumption which obtains in the absence of evidence a court would not be justified in declaring from the record before us that the deceased was not, during the approach of the Meteor, engaged in the performance of some duty of his position or of some order of the engineer that prevented him from observing either the presence or absence of a red light at the switch stand. Moreover, the evidence showed that even if the lamp had been burning and the fireman had been on the lookout at the precise instant, he could have seen the light just about four seconds before it came into the view of the engineer. Nor can we assume, in the absence of evidence, that if the fireman was on the lookout and observed that there was no light at the switch stand he did not seasonably notify the engineer who was in charge of the engine. It is not necessary for us to determine in this case whether the engineer was or was not remiss in the performance of his duties. Even if he was it does not follow that his negligence is imputable to the fireman or that the right of the latter or his personal representatives to recover for the injury so caused is in any wise impaired thereby. The negligence of the engineer, if there was such, cannot be visited upon the fireman unless he concurred therein, and there must be proof, not mere surmise of such concurrence. The fellow-servant rule does not obtain in Kansas so far as concerns employés of railroad companies. Section 5858, Gen. St. of Kan. 1901.

It is also claimed that the red lights at the rear end of the stranded freight train as it stood upon the main track north of the station were a sufficient warning of danger. What we have already said applies to this contention. But, aside from it, the evidence leaves it doubtful that those lights could have been seen in time to be of service owing to the curve of the track and the presence of the station house as an obstacle in the line of vision. The evidence as to the conduct of the fireman, whether negligent or not, presented a fair question for the determination of the jury and they found against the contention of the company. The trial court was right in refusing to direct a different conclusion.

After the cause had been submitted to the jury and they had deliberated without result over one night they were brought into the court room on the following morning. In answer to questions

propounded by the court, the foreman of the jury said that they had not agreed upon a verdict; that he thought that it was impossible for them to agree; that they stood ten to one (one having been excused by consent) and that there had not been any change since the first ballot. Thereupon the court charged the jury as follows:

"I want to say to you, gentlemen of the jury, that this has been a very expensive trial to the litigants. It has consumed three days of the court's time, and that in justice to both parties, a verdict should be rendered if possible. The juror who is standing out against the other ten should listen to their arguments and should try and look at the case from their view point. As I charged you and now charge you, you are the exclusive judges of the evidence in this case."

An exception was preserved by the company to this action of the court. The jury again retired and a day later returned a verdict for the plaintiff.

The proper limits of the authority of a trial court when a jury is having difficulty in reaching a verdict were expressed by the Supreme Court in Allis v. United States, 155 U. S. 117, 123, 15 Sup. Ct. 36, 39 L. Ed. 91, in Allen v. United States, 164 U. S. 492, 501, 17 Sup. Ct. 154, 41 L. Ed. 528, and in Burton v. United States, 196 U. S. 283, 307, 25 Sup. Ct. 243, 49 L. Ed. 482. It is true these were criminal cases but we know of no reason why their doctrine is not equally applicable to cases of a civil character. When the Allis Case was tried at the circuit, Judge Sanborn of this court presided. After the jury had deliberated for 24 hours without reaching a verdict the following carefully guarded instruction was given them (United States v. Allis, 73 Fed. 165, 182):

"This is an important case. The trial has been long and expensive. Your failure to agree upon a verdict will necessitate another trial equally as expensive. The court is of the opinion that the case cannot be again tried better or more exhaustively than it has been on either side. It is therefore very desirable that you should agree upon a verdict. The court does not desire that any juror should surrender his conscientious convictions. On the other hand, each juror should perform his duty conscientiously and honestly, according to the law and the evidence. And, although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusions of his fellows, yet, in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to 12 men more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other. In the present case the burden of proof is on the United States to establish its case beyond a reasonable doubt, and if, upon any count of the indictment submitted to you, you have a reasonable doubt, based upon the evidence, of the guilt of the defendant, you ought to acquit him on that count. But, in conferring together, you ought to pay proper respect to each other's opinions, with a disposition to be convinced by each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself,

who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought seriously ask themselves whether they may not reasonably, and ought not to, doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows."

## On appeal the Supreme Court said:

"It is a familiar practice to recall a jury after they have been in deliberation for any length of time for the purpose of ascertaining what difficulties they have in the consideration of the case, and of making proper efforts to assist them in the solution of those difficulties. It would be startling to have such action held to be error, and error sufficient to reverse a judgment. The time at which such a recall shall be made, if at all, must be left to the sound discretion of the trial court, and there is nothing in the record to show that the court, in the case at the bar, abused this discretion or failed to wait a reasonable time for the consideration of the case by the jury under the charge as already given."

## In the Allen Case it was said:

"The seventeenth and eighteenth assignments were taken to instructions given to the jury after the main charge was delivered, and when the jury had returned to the court, apparently for further instructions. These instructions were quite lengthy and were, in substance, that in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. These instructions were taken literally from a charge in a criminal case which was approved of by the Supreme Court of Massachusetts in Commonwealth v. Tuey, 8 Cush. (Mass.) 1, and by the Supreme Court of Connecticut in State v. Smith, 49 Conn. 376, 386."

In the Burton Case the trial court asked the foreman how the jury were divided, not how many were for conviction and how many for acquittal, but the bare proportion of their division; and the answer was "eleven to one." The court then charged them in the words of the Allen Case. Of the inquiry how the jury stood the Supreme Court said.

"We must say in addition, that a practice ought not to grow up of inquiring of a jury, when brought into court because unable to agree, how the jury is divided; not meaning by such question, how many stand for conviction or how many stand for acquittal, but meaning the proportion of the division, not which way the division may be. Such a practice is not to be commended, because we cannot see how it may be material for the court to understand the proportion of division of opinion among the jury. All that the judge said in regard to the propriety and duty of the jury to fairly and honestly endeavor to agree could have been said without asking for the fact as to the proportion of their division; and we do not think that the proper administration of the law requires such knowledge or permits such a question on the part of the pre-

siding judge. Cases may easily be imagined where a practice of this kind might lead to improper influences, and for this reason it ought not to obtain."

In view of the foregoing rules we are of the opinion that error was committed in the case at bar in the inquiry of the foreman of the jury as to their division and in the succeeding charge. The charge itself was not sufficiently guarded. Its tendency was to bring the one juror to an agreement with the others even against the dictates of his own judgment.

The judgment is reversed, and the cause remanded for a new trial.