## NIGRO v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. March 9, 1925.)

No. 6632.

1. **Poisons** ⊂⇒4—**Scienter necessary element of offense of purchasing narcotic drugs not in original stamped packages.**

Scienter is necessary element of offense of purchasing narcotic drugs, except from or in original stamped packages, denounced by Anti-Narcotic Act, § 1, as amended and re-enacted by Act Nov. 23, 1921, § 1005 (Comp. St. Ann. Supp. 1923, § 6287g).

2. **Criminal law** ⊂⇒864—**After jury failed to agree, asking whether there was predominance in one way or another held error.**

After jury failed to agree, and court had told foreman that it would not ask him to say how jury stood, question asked him whether predominance of individual jurors was one way or the other, eliciting answer that there was predominance, *held* error.

3. **Criminal law** ⊂⇒865(1)—**Supplemental instruction as to reaching agreement held erroneous.**

Where jury had deliberated for some time, supplemental instruction as to reaching agreement, consisting of abstract statement from opinion in another case, *held* erroneous, as forcibly urging deference by minority of jury to view of majority without properly calling attention to positive duty of each juror to form and make his verdict express his own honest conviction.

In Error to the District Court of the United States for the Western District of Missouri; Albert L. Reeves, Judge.

Criminal prosecution on separate indictments, consolidated for trial, by the United States against Mike Nigro. Judgment of conviction, and defendant brings error. Reversed, with instructions to grant a new trial.

L. C. Boyle and A. N. Gossett, both of Kansas City, Mo. (E. C. Ellis, of Kansas City, Mo., on the brief), for plaintiff in error.

Charles C. Madison, U. S. Atty., of Kansas City, Mo. (Samuel M. Carmean, Sp. Asst. U. S. Atty., of Kansas City, Mo., on the brief), for the United States.

Before SANBORN, Circuit Judge, and TRIEBER and PHILLIPS, District Judges.

PHILLIPS, District Judge. Mike Nigro, hereinafter called defendant, was charged by one indictment with having purchased 79 one-eighth ounce bottles of morphine and 73 one-eighth ounce bottles of cocaine, not in or from the original stamped package, contrary to the provisions of section 1, as amended, of the Anti-Narcotic Act (42 Stat. 298; Comp. St. Ann. Supp. 1923, § 6287g), and by another indictment with knowingly having in his possession certain false, forged, and counterfeit internal revenue stamps, in resemblance and similitude of the stamps provided under section 1, as amended, of the Anti-Narcotic Act (42 Stat. 298; Comp. St. Ann. Supp. 1923, § 6287g), contrary to the provisions of section 151 of the Criminal

Code (35 Stat. 1116; Comp. St. § 10321). The indictments were consolidated for the purposes of trial, and the defendant was found guilty and sentenced under both indictments.

The defendant was a registered pharmacist and operated a drug store in Kansas City, Mo. On or about January 24, 1923, C. O. Bradshaw, a narcotic agent, and W. O. McDonald, an officer employed by the Law Enforcement Association of Kansas City, made an inspection of defendant's narcotic drugs at his place of business, then located at 600 East Fifth street, Kansas City, Mo. At the time of this inspection McDonald believed the stamps on part of the drugs looked queer and so advised Bradshaw. Thereafter the defendant sold his store at 600 East Fifth street, and on February 15, 1923, opened a store at 123 East Fifth street. He reserved from the sale his stock of liquors and narcotics, and moved the same to his new location on February 15, 1923. On the morning of February 20, 1923, Bradshaw made another inspection of defendant's narcotic drugs at the new location. After examining the drugs, he went to the office of W. H. Davenport, an officer in the United States Secret Service specially charged with the enforcement of the laws relating to counterfeiting. During the afternoon of February 20, 1923, Davenport and Bradshaw returned to defendant's drug store, examined the narcotic drugs, and determined that part of the drugs were stamped with counterfeit stamps. They seized the entire stock, consisting of 188 one-eighth ounce bottles of cocaine and a small package of cocaine, and 179 one-eighth ounce bottles of morphine and a portion of a bottle of morphine, and took the same to the office of Mr. Davenport. They there examined and checked the drugs in the presence of the defendant, and found counterfeit stamps on 79 bottles of morphine and 73 bottles of cocaine.

The defendant testified that at the time the stocks of narcotics and liquors were moved from the old to the new location he had in his employ a clerk by the name of Pennimore, who had worked for him approximately one month prior to February 15, 1923; that Pennimore moved the stock of narcotics in an automobile from the old to the new location; that on the night of February 15, 1923, Pennimore disappeared, having four days' pay coming to him; that defendant had endeavored to locate Pennimore, but had been unable to do so; that at the 600 East Fifth street store the narcotics were kept in a closet, the key to which was left in an unlocked drawer back of the prescription case; that shortly after the narcotics had been moved to the new location defendant noticed them on the floor in a small room which had been prepared for their safe-keeping, in about the same order as they had been kept in the old store; that his attention was not again called to the narcotics until February 20, 1923, when the inspection was made by the officers; that he had purchased the narcotics in good faith from Betz & Co. of Hammond, Ind., and prior to February 20, 1923, believed they carried genuine stamps; that he did not know how or when the drugs bearing the counterfeit stamps came into his stock; that in his opinion drugs with spurious stamps had been placed in his stock without his knowledge, and legitimate drugs taken therefrom; and that his records of purchases and sales indicated that he should have had in his stock on February 20, 1923, legitimate drugs equal to the total amount of legitimate drugs and spuriously stamped drugs found and seized on that date. Defendant also produced 10 witnesses, most of whom had known him from childhood, who testified to his good character.

In his charge to the jury, with reference to the first indictment above referred to the learned trial judge, among other things, said:

"Now, gentlemen, the law is that, if any person happens to have possession of such container without the revenue stamp of the government affixed, even though that person is a registrant, such person violates this law; and if he has possession of such drug as a dealer, then the law presumes that such person made an unlawful purchase of the drugs. It is not necessary under the law for the government to show that such person made the actual purchase, but the mere possession of such drug in packages upon which the revenue stamp has not been affixed carries with it the presumption of an unlawful purchase.

"In this case the defendant says in his testimony that such drugs came into his hands by accident. If you believe from the testimony that such drugs did come into his possession by accident, or by substitution by some person unknown, and that he knew nothing about such drugs being in his possession, then, under such circumstances, of course, it will be your duty to acquit him.

"On the other hand, the government has shown to you that the drugs in question— that is to say, the quantities mentioned in

the indictments that were read to you—contained spurious or counterfeit or forged or false revenue stamps. It is hardly in controversy here that such stamps were spurious or forged.

"Now, gentlemen, if you find and believe from the testimony that a purchase of such drugs was made by the defendant, and that they had affixed to them these counterfeit stamps, if you believe they are counterfeit—and you would not be justified in reaching any other conclusion with respect to the stamps—then you will find the defendant guilty in this case, notwithstanding you may further find and believe he did not know that they were counterfeit or false or forged, because the government imposes on every dealer in this drug the obligation to take the chance, and to purchase such drug at his peril. He may be innocent of knowledge of this fact; he may believe they are genuine; but that does not satisfy the government. * * *

"The absence of an appropriate stamp means absence of the genuine revenue stamp. Not even a postage stamp that might be of greater value, not even a stamp that might be of equal value, will satisfy the government. There must be an appropriate narcotic stamp that must be placed on the package, regardless of the good intentions of the purchaser, under any circumstances. In other words, innocence on the part of the purchaser will not excuse him. So in this case, if you find from the evidence that the defendant purchased such drugs, and he was ignorant of the fact that these stamps were false or counterfeit or forged, you will find him guilty just the same on this indictment."

After the jury had deliberated for some time, they returned into open court, and the following, as disclosed by the record, from which we quote, occurred:

"The court inquired of the foreman of the jury if they had agreed upon a verdict. The foreman replied that the jury had not agreed. The court inquired if the foreman thought they would likely agree. The foreman replied that it did not appear that they would likely be able to agree. The court then inquired if the difficulty of the jury was upon a question of fact or in respect to the law of the case, and stated that if it was upon a matter of law he would give further instructions, if they would indicate the difficulty, but if it was upon a question of fact he would not be able to help them. The foreman replied that it was upon a question or issue as to facts. The court then requested the foreman that, without indicating how

the jury stood in numbers, he, the foreman, should state to the court whether or not there was a predominance of the individual jurors in favor of a verdict one way or the other; the foreman replied there was a predominance. The court then instructed the jury that they should be subject, in their conferences and consultation among themselves, to the effect of reasonable argument, and should not obstinately and unreasonably hold out against a verdict, and should consider in their own minds, and with reason, the arguments and grounds advanced by their fellow jurors for arriving at a verdict under the evidence and instructions of the court.

"The Court: To illustrate my meaning, I will read to you an extract from a case decided by the Supreme Court of the United States (Allen v. U. S., 164 U. S. 492, 17 S. Ct. 154, 41 L. Ed. 528):

"'That although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority. * * *

"'While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of

men who are equally honest and intelligent as himself.'"

To the principal charge and supplemental charge above set out the defendant, through his counsel, duly excepted.

[1] One assignment of error urged by counsel for defendant is that the court erred in charging the jury in substance that if the defendant purchased the narcotics, and the stamps affixed thereto were counterfeit stamps, he would be guilty under the first indictment above referred to, even though he acted in good faith, believed the stamps were genuine, and had no knowledge that they were counterfeit.

This assignment presents a serious question and requires a construction of section 1 of the act. To support the correctness of the charge, counsel for the government rely upon the decision of the Supreme Court in U. S. v. Balint et al., 258 U. S. 250, 42 S. Ct. 301, 66 L. Ed. 604. In that case the defendants were charged with an unlawful sale of narcotics contrary to the provisions of section 2 of the act (Comp. St. § 6287h). A demurrer was interposed to the indictment on the ground that it failed to charge defendants sold the inhibited drugs knowing them to be such. The court said:

"While the general rule at common law was that the scienter was a necessary element in the indictment and proof of every crime, and this was followed in regard to statutory crimes, even where the statutory definition did not in terms include it (Reg. v. Sleep, 8 Cox, C. C. 472), there has been a modification of this view in respect to prosecutions under statutes the purpose of which would be obstructed by such a requirement. It is a question of legislative intent to be construed by the court. It has been objected that punishment of a person for an act in violation of law, when ignorant of the facts making it so, is an absence of due process of law. But that objection is considered and overruled in Shevlin-Carpenter Co. v. Minnesota, 218 U. S. 57, 69, 70, in which it was held that, in the prohibition or punishment of particular acts, the state may in the maintenance of a public policy provide 'that he who shall do them shall do them at his peril, and will not be heard to plead in defense good faith or ignorance.' Many instances of this are to be found in regulatory measures in the exercise of what is called the police power, where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes as in cases of mala in se.

"* * * The question before us, therefore, is one of the construction of the statute and of inference of the intent of Congress."

Proceeding to determine whether or not scienter was a necessary element of the crimes defined in section 2 of the act, the court further said:

"It is very evident from a reading of it [section 2] that the emphasis of the section is in securing a close supervision of the business of dealing in these dangerous drugs by the taxing officers of the government, and that it merely uses a criminal penalty to secure recorded evidence of the disposition of such drugs as a means of taxing and restraining the traffic. Its manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and, if he sells the inhibited drug in ignorance of its character, to penalize him. Congress weighed the possible injustice of subjecting an innocent seller to a penalty against the evil of exposing innocent purchasers to danger from the drug, and concluded that the latter was the result preferably to be avoided. Doubtless considerations as to the opportunity of the seller to find out the fact and the difficulty of proof of knowledge contributed to this conclusion."

It will be noted that section 2 of the act under consideration in the Balint Case makes it unlawful for any person to sell, barter, exchange, or give away any of the inhibited drugs, except in pursuance of a written order of the person to whom such drugs are sold, bartered, exchanged, or given. The reasons assigned in the Balint Case for holding scienter not an element of the offense do not apply with equal force to section 1 of the act. In the case of imported narcotics the importer must pay the tax by attachment of proper stamps before the goods are withdrawn from customs custody. In the case of domestic narcotics the domestic manufacturer, compounder, or producer must pay the tax by the attachment of proper stamps before the goods are withdrawn from the place of domestic manufacture. No duty to pay a tax thereon by attachment of stamps devolves upon the purchaser, except in cases of repacking or remanufacture. If scienter is not a necessary element of the offense defined in section 1, prohibiting sales except from or in the original stamped package, the act, instead of protecting the innocent purchaser, would make him a criminal. The purchaser has not the same ability and opportunity to find out the fact under sec-

tion 1 of the act as the seller has under section 2 of the act. The purchaser might easily be deceived by counterfeit stamps. In many instances, such a purchaser would have no opportunity in advance of the sale to examine the stamps on the drugs. Many retail dealers, physicians, and dentists are unable to purchase the drugs in the immediate vicinity of their place of business, and have to order them from distant points for shipment to them by express.

Suppose, for example, a duly registered retail dealer, physician, or dentist placed an order for narcotic drugs with a reputable and registered wholesaler at some distant point to be shipped by express, that the wholesaler had in his employ an unfaithful employee, who had taken legitimate drugs from the stock of the wholesaler and substituted spuriously stamped drugs therefor, and that the latter were delivered to the express company for shipment to the purchaser; upon delivery of such drugs to the express company, the agent of the buyer, title would pass, and the sale would be completed before the purchaser had any opportunity to determine whether he was buying properly stamped drugs or not. Suppose, again, for example, that spuriously stamped drugs were shipped from a reputable and duly registered wholesaler to a reputable and duly registered purchaser, and the counterfeit stamps were so near in resemblance to true stamps that the purchaser could not detect that they were counterfeit; was it the intent of Congress to make a purchase under such circumstances unlawful under section 1 of the act?

Many reasons may be assigned why the seller of narcotic drugs engaged in the wholesale or retail drug business and skilled in the knowledge of drugs should be required to determine at his peril whether an article which he sells is a narcotic drug, in order to afford protection to the purchaser, who would not have the same skill and ability to determine the character of the article. On the other hand, it would be wholly unreasonable to require an innocent purchaser, not specially skilled in detecting counterfeit stamps, and in many instances with no opportunity to examine the articles before the purchase was consummated, to buy such narcotic drugs at his peril. To so hold would compel retail dealers, physicians, and dentists to skill themselves in the detection of counterfeit stamps and to carefully examine the stamps on every order of drugs before purchasing the same. This, in many instances, would be impracticable and would prohibit their dealing in the drugs at all. The purpose of the law was not to prohibit all dealing in narcotic drugs, which, though dangerous, have many uses both proper and necessary, but was to confine them to sale and purchase for legitimate and proper uses.

We are of the opinion that scienter is a necessary element of the offense making it unlawful to purchase narcotic drugs except from or in the original stamped package.

[2, 3] The giving of the supplemental charge above set out is also assigned as error. This assignment applies to both indictments. The supplemental charge is substantially the same as that given in Stewart v. U. S. (C. C. A. 8) 300 F. 769, recently decided by this court. In the Stewart Case this court condemned the inquiry made of the jury as to how they stood, and the reading of the excerpt from the opinion of the Supreme Court in Allen v. U. S., 164 U. S. 492, 17 S. Ct. 154, 41 L. Ed. 528. In the instant case the question asked the jury was whether or not there was a predominance of the individual jurors in favor of a verdict one way or the other, and the foreman replied there was a predominance. In the Stewart Case the inquiry made was whether there was a large preponderance of the jurors one way or the other, and the foreman answered that there seemed to be a large preponderance one way. In the instant case the court read the two paragraphs above set out from the opinion of the Supreme Court in the Allen Case. In the Stewart Case the court read the second of those paragraphs. On the authority of the Stewart Case and for the reasons therein assigned, we hold that the inquiry made of the jury and the reading of the abstract statements from the Allen Case was error.

As pointed out by this court in the Stewart Case, a correct form for such a supplemental charge may be found in Commonwealth v. Tuey, 8 Cush. (Mass.) 1, and in U. S. v. Allis (C. C.) 73 F. 165. The charge in the Tuey Case was approved in Allen v. U. S., supra, and the charge in the Allis Case was approved in Allis v. U. S., 155 U. S. 117, 15 S. Ct. 36, 39 L. Ed. 91, and in St. Louis & S. F. R. Co. v. Bishard (C. C. A. 8) 147 F. 496.

We deem it unnecessary to notice the other assignments of error.

For the reasons above stated, the cause is reversed, with instructions to grant the defendant a new trial on both indictments; and it is so ordered.