**MARIENFELD v. UNITED STATES.**
**No. 14976.**

United States Court of Appeals
Eighth Circuit.

July 12, 1954.

Rehearing Denied Aug. 10, 1954.

Harry C. Blanton, Sikeston, Mo., and James A. Finch, Jr., Cape Girardeau, Mo., for appellant.

W. Francis Murrell, Asst. U. S. Atty., St. Louis, Mo. (Harry Richards, U. S. Atty., St. Louis, Mo., and Max H. Goldschein, Sp. Asst. to Atty. Gen., Department of Justice, on the brief), for appellee.

Before SANBORN, JOHNSEN, and COLLET, Circuit Judges.

COLLET, Circuit Judge.

Appellant was convicted of willfully attempting to evade his income taxes by filing a false income tax return for the year 1946. His defense was that

the money received by him that year which he did not report was money he embezzled and hence was not his income. The trial court filed a memorandum opinion in ruling on the motion for new trial. In that opinion appears the following statement of many of the salient facts:

"The defendant was in the business of selling beef and pork at wholesale under the name of Mar Meat Company, and in his meat operations engaged in a boning operation of beef and pork carcasses delivered to him by the Stokely-Van Camp Company (herein referred to as 'Stokely'). Stokely had a contract with the Government to put up canned meat rations for the Army. It used the boned meat for that purpose. After defendant boned the meat delivered to him by Stokely, the meat was shipped to Stokely for canning. For the boning operation defendant received payment from Stokely on a pound basis. Stokely furnished the packing materials, paid the freight, and paid the storage charges on boned meat that went to cold storage.

"In the boning operation there were certain by-products that could not be used in Army rations. Defendant was authorized by Stokely to sell these by-products for the 'account' of Stokely. The by-products were 'bones, suet, kidneys, skin, shank meat, ox joints and tenderloin.' Defendant did sell these. The tenderloin, in some instances, was converted by defendant into hamburger before sale. In making hamburger suet was added. Stokely did not authorize or have knowledge of the use of by-products, by defendant, to make and sell hamburger. Much of Stokely's meat after boning went to cold storage. The tenderloin which defendant made into hamburger was, for the most part, also placed in storage. Stokely's boned meat was placed in storage in its name, as Stokely had directed. The hamburger made from tenderloin was put in cold storage by defendant in his name without the knowledge of Stokely.

"Defendant, needing more money than he could honestly make, conceived a plan to get some of it out of the boning operation being done for Stokely. Defendant proceeded to sell a part of the by-products and withheld information of such sales from Stokely by keeping and sending false reports to Stokely. Income from such sales went into defendant's personal bank account and was used by him for personal purposes. All customers required a record of their purchases. Defendant furnished such a record by using 'dray tickets,' but kept off his office records any reference to such sales. The purchasers of meat products were unaware of defendant's fraudulent scheme. Defendant used dray tickets in each sale involved in his fraud on Stokely. The dray tickets so used, unlike those used in legitimate transactions, were unnumbered. Defendant's bookkeeper testified to the practice. Defendant did likewise. The bookkeeper testified that at defendant's direction, when money came into the office, collected on the unnumbered dray tickets, he made no record of it but delivered the money to defendant. Defendant used the same method of getting funds in the sale of both converted by-products of Stokely and unconverted by-products of Stokely. He used the same kind of unnumbered dray tickets in sale of products that were not Stokely by-products, which were not recorded on his books.

"The income on these unrecorded dray tickets represented the income which the Government claims defendant failed to report in his income tax return, knowingly and with intent to defraud the Government of the tax on the sums of money. Such is the basis of this prosecution.

"The record shows, and defendant admitted, that the income was not shown on defendant's books. It was from defendant's books that his tax returns were made by an auditor. The auditor testified he did not receive any unnumbered dray tickets from the defendant to use in making defendant's returns for the period covered by the prosecution. This testimony was not disputed by the defendant while he was on the stand. And although defendant took the stand as a

witness, he did not elect to testify to the events surrounding the preparation, signing and filing of the tax returns claimed by the Government to be fraudulent."

In addition to money kept by appellant in the manner detailed above, he also in many instances reported by-products as having been sold for one price when in fact they were sold for a higher price. He only remitted the lesser amount. Also, he charged Stokely for more packaging materials than he used.

In the charge to the jury, all money received by appellant, other than money received from the sale of by-products on unrecorded dray tickets, was eliminated from the jury's consideration.[1] In defining what would constitute income to appellant, the court charged the jury as follows:

"Now, generally speaking, unlawful money gains, as well as lawful ones, may constitute taxable gains when the taxpayer and recipient of money has such control over the money, as a practical matter, that he readily realizes economic value from it. This occurs when cash is delivered by its owner to the taxpayer in a manner which allows the taxpayer freedom to dispose of it at will. The money received may have been obtained by unlawful means, such as by fraud, converting property of another and processing and selling it and retaining the proceeds, even though the taxpayer might be liable to a claim from the owner of the original property for its cost price or some other consideration."

The court then instructed the jury that money obtained by appellant from the sale of by-products in their original state was not taxable income to him and he was not required to report it, but that if appellant took tenderloin or other meat products and converted it into some other product, such as meat ground into hamburger, and sold the converted product, the income from such sales was income to appellant which should have been reported.[2] (In the memorandum opinion the court concluded that all receipts from by-products, whether converted into other products or not, were taxable income of appellant.) Since appellant admitted the conversion of a large quantity of by-products, their sale, the retention of the proceeds of such sales, and his failure to report such receipts as income, and since the proceeds from such sales constituted a substantial sum, in effect, the only question left to the jury was the question of willfullness.[3]

1. "The sums represented by these unrecorded dray ticket sales are the sums which the Government claims the defendant intentionally omitted from his tax return, as to the period charged in the indictment, namely, 1946, with the intent to defraud the Government of the tax due thereon. No other money which has been mentioned in evidence will be considered by you as making up such amount so claimed by the Government to be omitted from the defendant's 1946 tax return."

2. "Now I say to you, as to the money which the defendant obtained by the sale of by-product from boning the Stokely meat, that money belonged to Stokely and not to the defendant, and that money was not taxable income to the defendant, and he was not required to report it on the income tax return; but if the defendant took tenderloin or other meat products, the property of the Stokely Company, which he was authorized to sell as tenderloin or in its original form, and converted it into some other product, such as meat ground into hamburger, without authority from Stokely—as I recall the testimony, there is no such authority in the evidence, from Stokely— and then sold the converted products, the income from such sales is income to the defendant which should have been reported in his tax return for 1946 for the income of that character which he received during that year."

3. In the same connection the jury was further charged as follows: "If you find from the evidence that these unrecorded dray tickets correctly describe the products listed—and Mr. Jost testified they did, and defendant's counsel was careful to develop during the testimony of the various witnesses that they did correctly list the products—then the income from the sale of meat products other than the by-products which the defendant was authorized to sell is income to the defendant which he should have included in his income tax return."

Thus the primary question for determination arises—was the income received from the sale of the converted byproducts reportable income of appellant or was it Stokely's money which appellant did not obtain such a proprietary interest in or dominion over as to constitute it income to him.

■■ Appellant says that since his acts in question were committed in Missouri, the law of Missouri should be applied in determining the legal effect of those acts; that such acts amounted to embezzlement under Missouri law,[4] and hence under the doctrine of Commissioner of Internal Revenue v. Wilcox, 327 U. S. 404, 66 S.Ct. 546, 549, 90 L.Ed. 752, the embezzled funds were not income to appellant. But the present question is not whether appellant was guilty of embezzlement under the law of Missouri, but whether the funds he received were his income under the Act of Congress defining taxable income. State law will not be decisive in that determination. Daine v. Commissioner, 2 Cir., 168 F.2d 449, 451, 4 A.L.R.2d 248. As stated in the Wilcox case:

"Moral turpitude is not a touchstone of taxability. The question, rather, is whether the taxpayer in fact received a statutory gain, profit or benefit. That the taxpayer's motive may have been reprehensible or the mode of receipt illegal has no bearing upon the application of Section 22 (a)."

Although in the Wilcox case the opinion refers to the fact that under the law of Nevada the embezzlement was complete when the appropriation was made and that under Nevada law the rightful owner was entitled to replevy the money or have it summarily restored as soon as it was appropriated, we do not understand the opinion to hold that the varying local law of different states will determine for federal income tax purposes what shall be treated as taxable income under the federal income tax laws.

We find it difficult to reconcile the Wilcox case with the later opinion of the Supreme Court in Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 576, 96 L.Ed. 833. Since four members of that court were unable to do so, we shall not attempt to do so, but will apply the reasoning of both cases in reaching a solution to our present problem.

In the Wilcox case the court approved the previously declared criterion for determining taxable income as depending "'upon the enjoyment by the taxpayer of privileges and benefits so substantial and important as to make it reasonable and just to deal with him as if he were the owner, and to tax him on that basis.'" And further—"In fact, no single, conclusive criterion has yet been found to determine in all situations what is a sufficient gain to support the imposition of an income tax. No more can be said in general than that all relevant facts and circumstances must be considered."

The Wilcox case was a clear-cut case of embezzlement. The taxpayer was a bookkeeper who collected money due his employer and immediately pocketed it. The court held that under the foregoing general criterion the money was clearly embezzled funds of the bookkeeper's employer and not the bookkeeper's income.

In the Rutkin case the court reiterates previous expressions of the court (also found in the Wilcox opinion) that Sec. 22(a), cast in broad sweeping terms "supports the declarations of this Court that Congress in enacting that section [Sec. 22(a)] exercised its full power to tax income." The court laid down the criterion in the Rutkin case in the following language:

"An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L.Ed. 1439; Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even

4. Sec. 560.250, 560.260 MSMo 1949, V.A.M.S.

though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it."

Assuming from the jury's verdict, under the instructions given that the money receipts involved had been extorted by the taxpayer upon a threat to kill payor and his family, the court held without qualification that money obtained by extortion was taxable income to the extortionist under the clause of Sec. 22(a) : " * * * and income derived from any source whatever." We deem it noteworthy that in reaching the foregoing conclusion the court stated:

> "Petitioner's [the extortionist's] control over the cash so received was such that in the absence of Reinfeld's [the payor's] unlikely repudiation of the transaction and demand for the money's return, petitioner could enjoy its use as fully as though his title to it were unassailable."

This latter expression demonstrates the application in the Rutkin case of the principle stated in Commissioner of Internal Revenue v. Wilcox, heretofore quoted, that all relevant facts must be considered and no conclusive criterion has been found to determine all situations. Since the court in Commissioner of Internal Revenue v. Wilcox flatly held that embezzled funds were not taxable income to the embezzler and in the Rutkin case has unequivocally held that extorted funds were taxable income to the extortionist, the line of demarcation lies between those rather closely related factual situations and must be determined by the facts in the individual case.

The only distinction apparent to us between the facts in the present case and those in the Wilcox case is that the obligation of appellant to pay Stokely for the by-products was under the oral agreement and the practice followed, deferred until appellant had made a report showing the amount due Stokely and a statement had been rendered by Stokely to appellant for that amount, with the right of control, use and dominion over the funds during the interim, whereas in the Wilcox case the bookkeeper was under the immediate and instantaneous legal obligation to pay to his employer the money collected for the latter. In the Wilcox case the court lays down two requisites before the taxable gain may exist. First, "the presence of a claim of right to the alleged gain and (2) the absence of a definite, unconditional obligation to repay or return that which would otherwise constitute a gain. Without some bona fide legal or equitable claim, even though it be contingent or contested in nature, the taxpayer cannot be said to have received any gain or profit within the reach of Section 22(a)." Under the facts in this case, the agreement and the practice above referred to gave to appellant a purely temporary claim of right to the proceeds of the sale of the by-product, i. e., until the report was made and the statement was rendered. But we see no possible distinction between this case and the Wilcox case with reference to the existence of a bona fide legal or equitable claim to the money. Appellant, like Wilcox, had no bona fide claim. And the obligation of appellant to repay differed from that of Wilcox only in point of time.

The only factual distinction we find between the Rutkin case and the Wilcox case is that Rutkin extorted the funds in question under such circumstances that his "control over the cash so received was such that, in the absence of Reinfeld's unlikely repudiation of the transaction [the extortion] and demand for the money's return, petitioner could enjoy its use as fully as though his title to it were unassailable." The obligation to return was the same as in the Wilcox case. The obligation of an extortionist to return funds so taken and that of an embezzler is equally existent. Nor was there any bona fide legal or equitable claim to the money Rutkin extorted. The nature of appellant's possession, dominion over, opportunity for use of, and freedom to dispose of the funds in question is more synonymous with that existing in the Rutkin case. In our judgment this case is controlled by the Rutkin case.

There being no dispute of fact about appellant's relation to the funds, there was no factual issue in that regard for the jury to determine and the instruction was proper. The question of the willfullness of the appellant's acts was properly submitted and not now complained of.

██ Appellant interposed a plea of double jeopardy which was overruled. This was the second trial. At the first, after the jury had been considering a verdict for several hours, the foreman sent the trial judge a note stating it was hopelessly deadlocked. It was called to the courtroom and asked in what proportion they were divided, after being cautioned not to indicate how either group was voting. The foreman answered that it stood eight for conviction and four for acquittal; they were immediately discharged. In overruling the plea the court stated:

"The court finds and declares that the jury was discharged on July 6th, 1953, because of the contents of the note above referred to and the inability of the jury to agree upon a verdict. The inquiry made by the Court was collateral to the reason of the jury. The jury had informed the Court that they were hopelessly deadlocked, apparently at eight to four, and could not reach a verdict.
"s/Rubey M. Hulen,
Judge."

The motion incorporating the plea of double jeopardy called for the outright discharge of appellant. It necessarily did not and could not present any question of error arising in the second trial from which this appeal is taken. The inquiry was ill-advised, under authority of Nigro v. United States, 8 Cir., 1925, 4 F.2d 781, yet it is the well-established rule, as appellant concedes, that a trial judge has the discretion to discharge a jury when it has become hopelessly deadlocked. The trial judge is the only person who can know why he discharged the jury. He states in the memorandum quoted that it was because of the jury's inability to reach a verdict. Upon the record before us we accept his statement. The record furnishes ample ground for the discharge of the jury upon that ground. This assignment must therefore be held to be without merit.

██ Complaint is made of the action of the trial court in excluding an audit made by appellant's accountant which showed the total amount of funds withheld by appellant, owing to Stokely, exceeded the amount which the Government claimed appellant unlawfully failed to report. The audit was presumably made from the exhibits which were in the courtroom, available to inspection by the Government. Under ordinary circumstances such a summarization of voluminous documentary evidence should be admitted. But since this evidence only went to show the amount of the funds which appellant claims were embezzled and hence not taxable income, that question was immaterial in the light of the fact that the funds were taxable income. The same is true of the exclusion of evidence tending to show appellant's acknowledgment of Stokely's rightful ownership of the unreported funds and his repayment of a portion thereof after the return of the indictment in this case.

██ On cross-examination appellant was asked and required to answer questions disclosing that he had failed to report more and different income than charged in the indictment. He contends that rules of proper cross-examination were violated and that he was forced to give evidence against himself. We find no error in the admission of this testimony. Appellant testified in considerable detail and extent that he fraudulently withheld from Stokely as much or more money than he was charged with failing to report. He thereby voluntarily furnished evidence that he failed to report taxable income, if the money belonging to Stokely which he withheld was taxable to him. He did so in order to exonerate himself from willfully attempting to evade taxes on his income. The only injury which could result to him from this testimony, in the event the funds he testified about fraudulently withholding were taxable to him, was to indicate that

his intent in failing to report his income was willful. Upon that ground this testimony was admissible. United States v. Manton, 2 Cir., 107 F.2d 834, 845.

▮ An instruction was requested and refused to the effect that appellant could not be convicted if no additional tax was due. Error is assigned on account of its refusal. Only in the event the unreported receipts were not taxable could this instruction be appropriate. Since they were taxable, the refusal of this instruction was not error.

Finding no error, the judgment is affirmed.

JOHNSEN, Circuit Judge (concurring specially).

I don't think anyone can be absolutely sure, on the basis of the Rutkin case, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, and the Wilcox case, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, just what the law objectively is on the general question that is here involved.

In the Rutkin case, the Court seems to have analogized extortion into the category of fraud, for tax purposes, saying that "it would be an extraordinary result to hold here that petitioner is to be tax free because his fraud was so transparent that it did not mislead his victim and his victim paid him the money because of fear instead of fraud." 343 U.S. at page 138, 72 S.Ct. at page 576.

The use of such a broad analogy would make it possible to regard any funds criminally acquired from another— whether through extortion, embezzlement, larceny, robbery, burglary or other similar means—as constituting in a sufficient sense fraud proceeds, to entitle them to be so treated in their tax consequence. But if the Court intended this to be the significance of the Rutkin case, there would have been no occasion for it to have left the Wilcox case standing as one of tax non-liability, and to say of it, as it did in the Rutkin opinion, supra, ibid., that "We limit that [embezzlement] case to its facts."

If the Rutkin case and the Wilcox case are not inconsistent, there must exist some basis on which to distinguish the difference in the treatment of the funds involved. Is there any distinction that can be made between them in relation to the use and enjoyment which Rutkin and Wilcox respectively had of the illegally acquired funds? There is none. Each had the full use and enjoyment of the funds in terms of economic value. Did the Court then mean to imply that there was a difference by virtue of the fact that in the Rutkin case, as in a fraud situation, the victim had himself turned over the money to the criminal for the latter's use, while in the Wilcox case he had not?

That difference would have the effect of making a holdup man subject to income tax, who permitted his victim to hand over his bill-fold, while leaving without tax liability one who compelled his victim to put his hands in the air and himself engaged in stripping the victim's pockets. Certainly Rutkin's victim, who testified that he paid the extortion funds to protect himself and his family from the danger of being shot, 343 U.S. at page 134, 72 S.Ct. at pages 573, 574, was not any more voluntarily or willingly doing so than would be a holdup victim in gladly handing over his bill-fold to save his life. The fact therefore that in the Rutkin case the victim had turned over the money to the criminal as the latter's own, and in the Wilcox case he had not, does not, in my opinion, afford any rational basis for distinguishing the two cases in their tax consequences.

If criminally acquired funds are at all to be subjected to tax liability—and I think they should be, just as much as any other economic gains, both as a tax matter and as a matter of justice and of deterrence in either individual or organized crime—that liability, it seems to me, can only and needs only to be predicated upon the simple and solid basis under the statute of actual economic gain, value and enjoyment having existed to the criminal. One who acquires funds by criminal means and uses them for his own purposes has had no less measure of economic gain, value and enjoyment from them than the law-abiding citizen can hope to obtain from the funds which he acquires in honest pursuits.

Tax liability necessarily is an economic not a moral question. No prostitute, narcotics peddler, or anyone else can escape the payment of income tax upon any earnings on moral grounds. No more should an embezzler, a thief, a robber, a burglar, or any other criminal be permitted to go tax-free or be immune from prosecution for evasion, upon the moral or legal basis that the money which he acquired was not technically his own but his victim's, as against the economic realities of the funds having been taken by him with intent to appropriate and enjoy them as his own, with such utilization and enjoyment actually having been made of them by him, and with him thus being left in the position of not being able to restore them as the identical object taken. As a tax matter, when these economic realities have existed, it also cannot affect the situation, I think, that the criminal may be able and may undertake, after he has been caught up with, to pay back the amount of his illegal acquisition, in funds not constituting the identical object which he took.

I have always felt that our decision in Kurrle v. Helvering, 8 Cir., 126 F.2d 723, which preceded the Wilcox case, was sound, and that of necessity there would ultimately have to come a return to that position. The Rutkin case is not capable of any practicable application or workability, if it is to be used merely to make artificial refinements in fact situations to escape the Wilcox case. And so I would not rest our decision in the present case on any narrow line of demarcation between whether appellant had an immediate or a deferred obligation to account for the funds which he collected. In either event, he misappropriated the funds, and the economic gain, value and enjoyment which he received resulted from the fact of that misappropriation.

I would affirm the conviction and sentence here upon the general basis which I have discussed above. The Rutkin case and any other attempt to impose tax liability for economic gain and enjoyment from criminally acquired funds can only soundly be made to rest on that ground.